613 So.2d 1193 (1993)
TEXACO, INC. and Gulf Coast Contracting Services, Inc.
v.
John D. ADDISON.
No. 90-CA-0115.
Supreme Court of Mississippi.
February 18, 1993.
*1195 John L. Low, IV, Watkins & Eager, Jackson, S. Robert Hammond Jr., Bryant Clark Dukes Blakeslee Ramsay & Hammond, Hattiesburg, Richard P. Salloum, Franke Rainey & Salloum, Gulfport, for appellants.
Samuel E. Farris, Hattiesburg, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and McRAE, JJ.
McRAE, Justice, for the Court:
This appeal challenges the jurisdiction of the Forrest County Chancery Court and its interpretation of the law in a November 9, 1989, award of damages to John D. Addison pursuant to the Jones Act, 46 U.S.C.A.App. § 688 (1988), and general maritime law. Finding that the case was properly before the chancellor, we affirm his findings that Addison was a Jones Act seaman and that Texaco and Gulf Coast Contracting Services are jointly and severally liable for the damages awarded.

I.
The appellee, John D. "Dan" Addison, injured his back on May 28, 1977, while working on the reconstruction of an off-shore oil collection and storage facility owned by appellant, Texaco, Inc. At the time of the injury, Addison was working as a roustabout for appellant, Gulf Coast Contracting Services, Inc. The injury occurred when five crew members were carrying a length of heavy pipe across the fixed platform. Addison, who was somewhat taller than the other men, stepped over a manifold pipe, assuming a disproportionate amount of its weight upon his shoulder and back.
Tank Battery # 49, where Addison was working when he was injured, is a fixed platform oil storage and collection facility in Garden Island Bay, a Texaco oil field, located near where the mouth of the Mississippi River joins the Gulf of Mexico. It is approximately twenty-two miles south of Venice, Louisiana, where the Texaco work camp was located. Over the years, the tank battery, which was supported by creosoted wood pilings driven into the floor of the bay, had begun to sink. As a result, water would wash over it at high tide, causing pollution problems. In order to keep the facility in production, it was renovated and raised one section at a time. C.L. Dill Contracting Company was hired to remove the equipment on the platforms, to break up the concrete and load it onto cargo barges, to dismantle and redrive the foundation pilings and to set up slabs and equipment. Lafitte Welders contracted to do the fabrication work, providing a welder and welder's helper to take the measurements and weld the components of the tank battery. Gulf Coast Contracting contracted with Texaco to provide the roustabout labor. Reconstruction of the tank battery took approximately six months.
Because the tank battery remained in production during the renovation process, the welder, Joe LeDoux, and his assistant, Shan LeDoux, fabricated the pipes aboard a welding barge, Texaco Barge # 102, which was kept moored to the tank battery. The barge was outfitted with a welding machine, strutting torches, tool boxes and a small shed. It was towed to the tank battery by a work boat or "lugger." Two or three times each hitch, it would be towed to shore for more pipes. The Gulf Coast crew accompanied the barge when it was moved to shore to help load supplies. They had the option of riding on the barge, itself, or in the lugger. A cargo barge was also moored at the tank battery for storing supplies.
Addison had been hired some six weeks before his injury by Charles "Wimp" McRaney, a Gulf Coast employee who was the "pusher" of the roustabout crew. The crew worked twelve hours a day on rotating hitches  seven days on, seven days off. Therefore, Addison had worked for only three hitches when he was injured. The crew was transported each day to and from the tank battery by a "lugger" boat. They *1196 slept and ate at the Texaco work camp in Venice, Louisiana. Lunch was brought to the welding barge each day by boat from the kitchen at the Texaco work camp.
Wilbert DuPlantis, a Texaco construction supervisor, was responsible for the overall supervision and installation of the Tank Battery # 49 reconstruction. He assigned roustabout crews and gave orders to McRaney, who in turn, directly supervised the Gulf Coast roustabouts. The roustabouts were charged with moving equipment onto the battery, hooking up and bolting parts that had been fabricated by the welders, threading screw pipe and installing handrails on the battery. They also installed the pumps on the tank battery and primed and painted its many pipes after they were installed. The roustabout crew also lifted fittings onto welding racks on the barge and kept its deck clean.
The relative amount of time the roustabout crew spent on the battery tank and the welding barge was hotly contested. Addison contends that he spent at least ten hours a day on the barge. McRaney likewise testified that Addison spent nine and one half hours a day on the barge. LeDoux, who testified that the Gulf Coast Crew did not assist in any of the actual welding, stated that the roustabouts spent approximately eighty percent of their time working on the tank battery, ten percent on the cargo barge and ten percent on the welding barge. DuPlantis, likewise, testified that the Gulf Coast crew spent ninety percent of its time on the tank battery, and divided the remaining time between the cargo barge and the welding barge.
It is undisputed that Addison was injured while he was on the tank battery. Addison narrated the events leading to his injury as follows:
Q. After you got up on the tank battery, how did you get the pipe up on your shoulders?
A. Well, there was five of use [sic], two on  just me and McRaney on my end, and three more on the other end. We all got it up on me and McRaney, one end, and then they went down to the other end and got it up on their shoulders.
Q. All right.
A. And the way the pipe was, when we started to go to the back of the tanks, it was in an angle and the tanks was here, and we  they had to go around and miss the tanks and then go that way. And there was a manifold, and I had to step up on the manifold to get where I was going. I had to follow where they was going. And I hurt my back when I stepped up on that. It took all the load on my back.
On the day Addison was injured, Gulf Coast was operating with a three-man crew. The record indicates that both LeDoux and his son, the welders, had helped carry the pipe. Addison and McRaney each testified that they normally worked with a five or six-man crew. Lloyd Wayne Ray, who owned Gulf Coast Contracting, testified that a five-member crew was not unusual, as did DuPlantis.
The size and length of the pipe which the crew was moving at the time of Addison's injury was greatly disputed. In his initial complaint and depositions, Addison stated that the pipe was forty feet long. It was noted on the accident report that the pipe was forty feet long. It then grew to fifty-six feet. Addison testified that he based his revised story on the his estimate that the space between the tanks on the battery was approximately fifty-six feet. McRaney likewise testified that the pipe was fifty-six feet long. Yet, LeDoux, who fabricated all of the pipe for the renovation of Tank Battery # 49, testified that the longest pipe he had made was between thirty-four and thirty-five feet long, and further, that he had never fabricated a fifty-six foot pipe for the project. Addison testified in his first trial that the pipe was a Schedule 40, whereas he now contends that it was a much heavier Schedule 80. McRaney likewise testified that they had used Schedule 80 pipe. Both LeDoux and DuPlantis asserted that only Schedule 40 pipe was used in the renovation of Tank Battery # 49, because it was a low pressure system.
Addison testified that he had asked McRaney to have the Dill crane barge moved to the site to lift the pipe and that *1197 he heard McRaney ask DuPlantis about the crane. McRaney likewise testified that he had asked DuPlantis about having the crane move the pipe into position because the crew felt it would be too heavy to lift manually. He further stated that DuPlantis told him that it would be too expensive and would require a work order to have a crane moved to the site. DuPlantis, however, testified that he did not remember a request for a crane being made on May 28, 1977. He further stated that had there been a fifty-six foot length of pipe to move, he would have arranged for the crane to move it.
As a result of his injury, Addison underwent back surgery three times. Gulf Coast has paid a majority of his medical bills as well as maintenance. His physician found that he suffered a fifty percent disability or anatomical impairment.
On September 29, 1977, Addison filed a Bill of Complaint and Attachment in Chancery against his employer, Gulf Coast Contracting Services, Inc., a Louisiana corporation, and myriad other garnishee defendants, alleged creditors of Gulf Coast. He sought recovery of damages in the amount of $985,000.00 for injuries he had sustained. Gulf Coast's motion to dismiss as to the garnishee defendants was granted on October 28, 1977 by the Forrest County Chancery Court.
After numerous continuances were granted, Gulf Coast filed a petition to dismiss for want of jurisdiction on August 2, 1979. Although the record is unclear, it appears that Texaco was again made a party in October, 1979. Texaco then filed in the United States District Court, Southern District of Mississippi, for removal of the case from the Forrest County Chancery Court, asserting that the federal court had original jurisdiction over the case pursuant to 28 U.S.C.A. § 1332. Addison's motions to remand were overruled.
Once in federal court, Texaco and Gulf Coast filed cross-claims against each other regarding potential liability for Addison's injuries. The United States District Court, however, in a January 26, 1984 opinion, ruled against Addison. Addison appealed the decision to the Fifth Circuit Court of Appeals. In Addison v. Gulf Coast Contracting Services, Inc., 744 F.2d 494 (5th Cir.1984), that Court found that the case had been improperly removed pursuant to 28 U.S.C.A. § 1441(c) and remanded it to the state court. The District Court then vacated its earlier judgment and remanded the case to the Forrest County Chancery Court on September 19, 1985.
Gulf Coast and Texaco filed a motion to dismiss for lack of subject matter jurisdiction or in the alternative, to transfer the case to the circuit court on February 20, 1987. Shortly thereafter, Texaco filed for bankruptcy following an adverse judgment against it in the Texaco-Pennzoil anti-trust litigation, thus staying the proceedings in the case sub judice. After being apprised that Texaco had emerged from bankruptcy, the chancellor notified the parties on January 19, 1989, that the case was set for trial on April 18, 1989.
On November 10, 1989, the chancellor denied Texaco and Gulf Coast's motions to remove the case to circuit court as well as the motion for an independent finding of facts. The chancellor adopted almost verbatim Addison's proposed findings of fact and conclusions of law, finding Texaco and Gulf Coast jointly and several liable to Addison for damages in the amount of $195,000.00.

II.
This case had its genesis as a Bill of Complaint and Attachment in Chancery against Addison's employer, Gulf Coast, in 1977. On Texaco's motion, it was removed to the United States District Court, Southern District of Mississippi. Addison appealed the District Court's ruling against him to the Fifth Circuit Court of Appeals. In Addison v. Gulf Coast Contracting Services, Inc., 744 F.2d 494 (5th Cir.1984), the Court found that the case had been improperly removed pursuant to 28 U.S.C.A. § 1441(c) and remanded it to the state court. The District Court then vacated its earlier judgment and remanded the case to the Forrest County Chancery Court. Texaco and Gulf Coast then filed a *1198 motion to transfer the case to Circuit Court. The chancellor denied the motion, stating:
But for the specific federal remand to this Court and Defendants' [sic] invocation of Chancery jurisdiction, this action would be properly triable in a Circuit Court. However, in view of the extenuated history of this case, it would be unfair and unjust now to transfer this action for a full third trial.
Citing Penrod v. Bounds, 433 So.2d 916 (Miss. 1983), Gulf Coast and Texaco assert that the chancellor abused his discretion in hearing a case outside the subject matter jurisdiction of the chancery court and therefor, as a matter of law, the case should be reversed. However, Miss. Const. art. 6, § 147 states as follows:
No judgment or decree in any chancery or circuit court rendered in a civil cause shall be reversed or annulled on the ground of want of jurisdiction to render such judgment or decree, from any error or mistake as to whether the cause in which it was rendered was of equity or common-law jurisdiction; but if the Supreme Court shall find error in the proceedings other than as to jurisdiction, and it shall be necessary to remand the case, the Supreme Court may remand it to the court, which, in its opinion, can best determine the controversy.
We have consistently held that we will not reverse a final judgment solely on the grounds that it was heard in the wrong court. Ivy v. Illinois Central Gulf Railroad Co., 510 So.2d 520 (Miss. 1987); Volkswagen of America, Inc. v. Novak, 418 So.2d 801 (Miss. 1982); Louisville & Nashville Railroad Co. v. Hasty, 360 So.2d 925 (Miss. 1978). See also Tillotson v. Anders, 551 So.2d 212, 219-227 (Miss. 1989) (Hawkins, J., dissenting) (extensive discussion of Section 147 as it applies to both final judgments and interlocutory appeals). Texaco and Gulf Coast appear to contend that because the chancellor recognized that he did not have subject matter jurisdiction over the case and nevertheless heard it on remand, the case is outside the scope of Section 147.[1] Even Penrod, the only case upon which they even remotely rely, speaks to the contrary, although it may be distinguished because the parties had made no attempt to remove the case. The Court in Penrod quoted Cazeneuve v. Curell, 70 Miss. 521, 13 So. 32 (1893) for the proposition that:
We find here practical authority for the virtual obliteration of the lines of demarcation between courts of law and equity, if the judges and chancellors of the inferior courts choose to disregard, or fail to observe the distinguishing lines. And this court is forbidden to reverse or annul decrees or judgments rendered in lower courts, even if there was want of jurisdiction, if no other error than want of jurisdiction is to be found.
* * * * * *
The language is plain, unambiguous, all-comprehensive. The purpose of this 147th section of the constitution is to prevent reversals because of want of jurisdiction in the court below.
70 Miss. at 524-525, 13 So. at 33.
Ordinarily, issues such as those raised in this case involving the "seaman" status of a plaintiff are questions for a jury to determine. Coulter v. Texaco, Inc. 714 F.2d 467, 468 (5th Cir.1983). However, finding that neither party demanded a jury trial nor was prejudiced thereby, we refuse to reverse solely on the grounds that the case was heard in chancery court, the court of original jurisdiction.

III.
The Jones Act, 46 U.S.C.App. § 688, provides a cause of action in negligence for "any seaman" injured "in the course of his employment." McDermott International v. Wilander, 498 U.S. 337, 111 S.Ct. 807, *1199 112 L.Ed.2d 866 (1991). The Act, however, does not define "seaman." Most jurisdictions long have followed the definition articulated in Offshore Company v. Robison, 266 F.2d 769, 779 (5th Cir.1959) which holds:
[T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during its anchorage for future trips.
In McDermott, the U.S. Supreme Court endorsed the Robison test and "jettisoned" the more stringent "aid in navigation" test originally rejected in Warner v. Goltra, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254 (1934) but still espoused in the case upon which McDermott International had relied, Johnson v. John F. Beasley Construction Co., 742 F.2d 1054 (7th Cir.1984). 498 U.S. at ___, 111 S.Ct. at 809, 112 L.Ed.2d at 873. The McDermott Court held that:
The key to seaman status is employment-related connection to a vessel in navigation. We are not called upon here to define this connection in all details, but we hold that a necessary element of the connection is that a seaman perform the work of a vessel. See Maryland Casualty Co. v. Lawson, 94 F.2d 190, 192 (5th Cir.1938) ("There is implied a definite and permanent connection to a vessel, an obligation to forward her enterprise") cited approvingly in Norton [v. Warner Co.,] 321 U.S. [565], at 573, 88 L.Ed. 931, 64 S.Ct. 747 [at 751-52 (1944)]. In this regard, we believe the requirement that an employee's duties must "contribut[e] to the function of a vessel or to the accomplishment of its mission" captures well an important requirement of seaman status. It is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work.
498 U.S. at ___, 111 S.Ct. at 817, 112 L.Ed. at 882.
The Supreme Court further held that "[t]he inquiry into seaman status is of necessity fact-specific; it will depend on the nature of the vessel, and the employee's precise relation to it." 498 U.S. at ___, 111 S.Ct. at 818, 112 L.Ed.2d at 883. Accordingly, as all parties to this case agree, whether Addison may recover from Texaco or Gulf Coast under the Jones Act is predicated upon whether his employment as a roustabout carries "seaman" status, which in turn, rests on whether he was assigned to a "vessel."
Whether Addison is a "seaman" is a mixed question of law and fact. Evans v. United Arab Shipping Co. 767 F. Supp. 1284, 1291 (D.N.J. 1991); McDermott, 498 U.S. at ___, 111 S.Ct. at 818, 112 L.Ed.2d at 883. Where the court sits as factfinder in a nonjury case, it must find the facts and apply the correct legal standard. Evans, 767 F. Supp. at 1291.
Gulf Coast and Texaco focus their assignment of error on the chancellor's finding that Addison was assigned as a crew member to the Texaco welding barge rather than to the fixed platform Tank Battery # 49. Under Robinson and its progeny, a finding of "seaman" status is predicated upon a showing that the injured party was permanently assigned to a vessel or performed a substantial part of his work upon a vessel. 266 F.2d at 779 (emphasis added). Moreover, the duties which he performed must have "contributed to the function of the vessel or the accomplishment of its mission, or to the operation or welfare of the vessel." Id. In determining whether a worker spends a "substantial part" of his time aboard a vessel, the Fifth Circuit has stated that "if the employee's regularly assigned duties required him to divide his time between vessel and land (or platform) his status as a *1200 crew member is determined `in the context of his entire employment' with his current employer." Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1075 (5th Cir.1986) (quoting Longmire v. Sea Drilling Corp., 610 F.2d 1342, 1347 (5th Cir.1980)).
The chancellor found that Addison was permanently assigned to Texaco Barge # 102; that he performed a substantial part of his work on the barge; and that the duties he performed contributed to its function and the accomplishment of its mission, as well as to its operation and welfare. Having reviewed the conflicting testimony in the record, we find that there is sufficient evidence to support the chancellor's findings.
Accepting the chancellor's finding that Addison was assigned to the welding barge, Texaco Barge # 102, rather than to the fixed platform, Tank Battery # 49, he can recover under the Jones Act if the welding barge was, indeed, a "vessel." In his findings of fact, the chancellor stated:
Texaco Barge No. 102 was a vessel; it was in navigation at the time of Addison's injury; the waters upon which it was located were navigable; Addison was assigned permanently to this vessel. He performed a substantial part of his work on the vessel and the duties he performed contributed to the function of the vessel and the accomplishment of its mission and also to the operation and welfare of the vessel in terms of its maintenance during its movement to the pipe rack and warehouse to secure pipe and materials.
The Jones Act does not define the term "vessel." Our sister jurisdiction, Louisiana, has employed the maritime law "capability" test which encompasses "every description of watercraft or other contrivance used or capable of being used as a means of transportation on water." Orgeron v. Avondale Shipyards, Inc., 561 So.2d 38, 41 (La. 1990). In Orgeron, the court found that a barge used as a work platform was a "vessel" because it was capable of navigation on water and at the time of the accident, was floating on navigable water. Id. at 43. As in the case sub judice, the barge in Orgeron was free floating; it was not permanently attached to one location; it was pushed or pulled to shore when necessary; it was secured by bits and mooring lines; and it was subject to the perils of the sea.
We also note that the Louisiana Courts, applying the "capability test" also have found that a trial judge did not abuse his discretion in finding that a welder who fell on a welding barge, Danos v. McDermott, Inc., 563 So.2d 968 (La. App. 3d Cir., 1990) and a worker on a drilling rig which had been attached to a pontoon barge, McFarland v. Justiss Oil Co., Inc., 526 So.2d 1206 (La. App. 3d Cir.1988), were seamen.
The welding barge to which Addison was assigned was not only capable of being used as "a means of transportation on water" but actually used for that purpose. The record indicates that it was regularly used to move men and materials between the shore and the tank battery. We find, therefore, that the chancellor did not err in finding that the barge is a vessel, and accordingly, that Addison was a "seaman" for purposes of the Jones Act.

IV.
An employer-employee relationship is a necessary requisite to a Jones Act claim. Volyrakis v. M/V Isabelle, 668 F.2d 863 (5th Cir.1982); Rohde v. Southeastern Drilling Co., Inc., 667 F.2d 1215 (5th Cir.1982). Although Addison testified that he was employed by Gulf Coast and was working for Gulf Coast at the time of his injury, he asserts, as well, that he was a borrowed servant of Texaco. The Fifth Circuit, in Addison, supra, 744 F.2d at 499, found that he had alleged sufficient facts to establish an employment relationship with Texaco. The chancellor then found that Addison was a borrowed servant or employee of Texaco. Texaco contends that the chancellor erred in so finding. On cross-appeal, Gulf Coast asserts that the chancellor was correct in finding that Addison was a borrowed servant of Texaco, but erred in finding that Gulf Coast could be his employer for purposes of the Jones Act.
*1201 In Continental Shipping Co. v. McAllister, 337 U.S. 783, 791, 69 S.Ct. 1317, 1322, 93 L.Ed. 1692, 1698 (1948) the Supreme Court observed that "[w]e have no doubt that under the Jones Act, only one person, firm or corporation can be sued as employer." However, there is a split among jurisdictions on the view that a seaman may sue more than one entity. See Annotation, Who is "Owner" of Vessel or "Employer" of Seaman for Maritime Purposes, 95 A.L.R.Fed. 636. The Fifth Circuit has taken the position that while a seaman may be the borrowed servant of one employer, he does not cease to be the employee of his immediate employer. Spinks v. Chevron Oil Co., 507 F.2d 216 (5th Cir.1975). The Fifth Circuit reasoned that because the Jones Act incorporates standards found in the Federal Employers' Liability Act, wherein an employee may have more than one employer, a seaman, likewise, could have more than one Jones Act employer, and sue each or both, allowing the employers to determine who would bear the costs of liability. Id. at 225. See also, Allen v. Brown & Root, Inc. 491 F. Supp. 398 (S.D.Tex. 1980).
The borrowed servant doctrine was first applied specifically to maritime law in Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). It enables the injured worker to place the risk of his injury "on his actual rather than his nominal employer by permitting the injured worker to recover from the company that was actually directing his work." Hall v. Diamond M. Co., 635 F. Supp. 362, 364 (E.D.La. 1986) (emphasis added); Baker v. Raymond International, Inc., 656 F.2d 173, 178 (5th Cir.1981). Thus, a plaintiff may sue a number of "employers," forcing them to present their relative culpability to the finder of fact. Hall, 635 F. Supp. at 364.
The Fifth Circuit follows the guidelines set forth in Ruiz v. Shell Oil Co., 413 F.2d 310, 312-313 (5th Cir.1969) to determine whether a borrowed servant relationship exists for purposes of Jones Act and Longshoreman's Compensation cases. Determination of borrowed servant status is to be made without reference to the plaintiff's status as a seaman. Guidry v. South Louisiana Contractors, Inc., 614 F.2d 447, 455 (5th Cir.1980). The nine Ruiz factors were summarized in Hall as follows:
1) who has control over the employee and work he is performing, beyond mere suggestion of details or cooperation?
2) whose work is being performed?
3) was there an agreement, understanding or meeting of the minds between the original and the borrowed employer?
4) did the employee acquiesce in the new work situation?
5) did the original employer terminate his relationship with the employee?
6) who furnished the tools and place for performance?
7) was the new employment over a period of time?
8) who had the right to discharge the employee?
9) who had the obligation to pay the employee?
635 F. Supp. at 365.
While no fixed test need be applied, the first factor is weighed most heavily in determining whether an employee is a borrowed servant. Ruiz, 413 F.2d at 312; Capps v. N.L. Baroid-N.L. Industries, Inc., 784 F.2d 615, 617 (5th Cir.1986). Applying the Ruiz factors, we find that Addison was performing Texaco's work as well as working, sleeping and eating on Texaco-owned facilities. More importantly, the control exercised by Texaco over the tank battery reconstruction project was more than sufficient to warrant the chancellor's finding that Addison was a borrowed servant. This does not, however, preclude the action against Gulf Coast.

V.
Gulf Coast further asserts that the chancellor erred in finding that it was negligent in failing to provide Addison a safe place to work, to properly supervise its employees and agents, and to provide a sufficient number of crew members and adequate tools and equipment.
The mere fact that a seaman is injured does not per se render his employer *1202 liable absent a showing of negligence. M. Norris, The Law of Seamen (4th Ed. 1985) § 30:34. However, evidence of even the "slightest" negligence is sufficient to find liability under the Jones Act. Johnson v. Offshore Express, Inc. 845 F.2d 1347, 1352 (5th Cir.1988); Theriot v. J. Ray McDermott & Co., Inc., 742 F.2d 877, 881 (5th Cir.1984); Allen v. Seacoast Products, Inc., 623 F.2d 355, 361 (5th Cir.1980). The burden of proof in a Jones Act claim has been described as "featherweight." Johnson, 845 F.2d at 1352; Smith v. Trans-World Drilling Co., 772 F.2d 157, 162 (5th Cir.1985); Davis v. Hill Engineering, Inc. 549 F.2d 314, 331 (5th Cir.1977). Although evidence regarding the size of the pipe is hotly disputed and Addison has refuted his own testimony from trial to trial, there is evidence that Gulf Coast was operating with less than a full crew at the time of the accident. Given the "featherweight" standard applicable to Jones Act claims, it cannot be said that the chancellor was clearly erroneous in finding that Gulf Coast was negligent.

VI.
The chancellor found Texaco and Gulf Coast to be jointly and severally liable to Addison for damages in the amount of $195,000.00 for lost wages, loss of future wage earning capacity and pain and suffering. Texaco and Gulf Coast argue that in light of Addison's demonstrated earnings record, this amount is excessive. Addison, however, contends that based on the findings of his expert witness, an economist, the amount is inadequate.
Under the Jones Act, an injured seaman may recover damages for pain and suffering, medical expenses and care, lost wages, and impairment of future earnings capacity. M. Norris, The Law of Seamen, (4th Ed. 1985) § 30:41. The trial court's assessment of damages is a finding of fact, which on appeal, is reviewed under the clearly erroneous standard. Johnson v. Offshore Express, Inc. 845 F.2d 1347, 1356 (5th Cir.1988); Hernandez v. M/V Rajaan, 841 F.2d 582, 587 (5th Cir.1988); Sosa v. M/V Lago Izabal, 736 F.2d 1028, 1035 (5th Cir.1984). Damage awards are only overturned when the trial judge has abused his discretion or "in exceptional cases where such awards are so gross as to be contrary to `right reason.'" Johnson, 845 F.2d at 1356 (quoting Bartholomew v. CNG Producing Co., 832 F.2d 326, 331 (5th Cir.1987)). Moreover, damage awards are reviewed not by comparing verdicts in similar cases, but by looking at the facts of each case. Id., Winbourne v. Eastern Airlines, Inc., 758 F.2d 1016, 1018 (5th Cir.1984), cert. denied, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 582 (1985).
There is, indeed, a great disparity between the economist's projection that Addison was capable of earning $338,205.00 during his lifetime, based on the $328.60 per seven-day hitch he had earned during the three hitches he worked for Gulf Coast and his prior earnings history. The same economist, using Addison's actual average annual income of $1,796.08 for the forty-one months prior to the accident, arrived at a future earnings capacity of $67,550.00 discounted to present value. However, given that Jones Act compensation includes pain and suffering as well as lost wages and loss of earnings capacity, it cannot be said that the chancellor was clearly erroneous or abused his discretion in his award of $195,000.00.

VII.
Having reviewed the record, we find that the chancellor had proper jurisdiction over the case and applied the correct legal standards. Accordingly, we affirm his finding that Addison was a Jones Act seaman at the time of his injury and thus entitled to collect damages in the amount of $195,000.00 from Texaco and Gulf Coast, who are jointly and severally liable.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and ROBERTS, JJ., concur.
SMITH, J., not participating according to Supreme Court Internal Rules.
NOTES
[1] The Appellants failed to raise Miss. Const. Art. 6, § 162 which provides that "[a]ll causes that may be brought in the chancery court whereof the circuit court has exclusive jurisdiction shall be transferred to the circuit court." Their argument is based solely on § 147. See also Duvall v. Duvall, 224 Miss 546, 80 So.2d 752 (1955) (when a court lacks subject matter jurisdiction, it has no authority to hear a case).