## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CT-00554-SCT

*ERNEST LANE, III, AND TRUSTMARK*
*NATIONAL BANK, CO-EXECUTORS OF THE*
*ESTATE OF JAMES OLDRUM SMITH, JR.*

*v.*

*RONALD D. LAMPKIN*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 03/19/2013 |
| TRIAL JUDGE: | HON. GEORGE WARD |
| TRIAL COURT ATTORNEYS: | HARRIS H. BARNES, III |
| | DAVID W. MOCKBEE |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | HARRIS H. BARNES, III |
| | JAMES WILLIAM JANOUSH |
| ATTORNEYS FOR APPELLEE: | DAVID W. MOCKBEE |
| | D. WESLEY MOCKBEE |
| | COLEMAN M. MOCKBEE |
| | LANDMAN TELLER, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 10/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.    Limestone Products, Inc. (Limestone), jointly owned by Ronald (Ronnie) Lampkin

and James Oldrum (J.O.) Smith, Jr., operated with a line of credit personally guaranteed by

Lampkin and Smith. Limestone was in the business of selling rock, predominantly to

Lampkin's company, Lampkin Construction. Following Smith's death and his estate's

subsequent refusal to guarantee Limestone's line of credit, Lampkin formed Delta Stone, a new corporation which operated on the same property, made use of the same facilities, and sold rock to the same clients to whom Limestone had sold. Lampkin sought a declaratory judgment against the Smith estate's executors that he was violating no fiduciary duties in continuing to sell Limestone's inventory. The executors counterclaimed, seeking lost profits and attorneys' fees. The chancellor bifurcated the trial and determined, in the liability stage, that Lampkin had breached his fiduciary duty to Limestone by usurping a corporate opportunity. In the damages phase of the trial, the chancellor heard expert testimony, assigned an award of damages to the Smith estate, and denied the executors' request for attorneys' fees, expert witness fees, and punitive damages. The executors appealed, and the case was assigned to the Court of Appeals, which affirmed. Finding that the chancellor erred in his calculation of damages, we now reverse and remand.

## FACTS[1]

In 1995, Lampkin and Smith formed Limestone, which they operated on land they jointly owned in Warren County. Lampkin and Smith each owned a one-half interest in the corporation, which bought and sold rocks. Lampkin also owned Lampkin Construction, which became one of Limestone's biggest customers.

For ten years, Limestone operated on a line of credit personally guaranteed by both Lampkin and Smith. The line of credit was set to expire in September 2006. In August 2006, Smith died, and his stock in the corporation and his interest in the real property transferred to the Estate. Prior to the expiration of Limestone's line of credit, Lampkin secured an extension until December 8, 2006, to provide the Estate with time to determine whether it would guarantee the loan. Between September 2006 and December 2006, the parties discussed renewing the line of credit. However, the Estate failed to provide a guarantee

---

[1]In part, the facts are taken *verbatim* from the opinion of the Court of Appeals.

before the deadline. Lampkin then formed a new corporation, Delta Stone, which began operating in January 2007. Delta Stone performed the same functions as Limestone, and through his new company, Lampkin completed Limestone's contracts and satisfied its debt obligations.

Lampkin filed a lawsuit against the Executors in Warren County Circuit Court. Lampkin asked the circuit court to find the following: (1) that Lampkin had the right to independently invest in and operate a rock-supply business; (2) that he was not in violation of his fiduciary duties as a director and officer of Limestone; (3) that he possessed the authority as an officer of Limestone to continue to sell the corporation's existing inventory, collect accounts receivable, and apply the monies received to the corporation's debt; and (4) that he should receive compensation for his actions and should be paid interest on any monetary advances made on the corporation's behalf. The Executors filed a counterclaim against Lampkin for present and future profits the corporation lost due to Lampkin's actions and for attorneys' fees. Lane, one of the co-executors, also filed a motion to transfer the matter to Warren County Chancery Court.

The circuit court judge entered an order finding the matter to be proper for a declaratory judgment. Further finding that the chancery court possessed proper jurisdiction over the subject matter of the declaratory-judgment action, the circuit court judge granted the motion to transfer the matter to chancery court. In an order entered by the Warren County Chancery Court, all the chancellors recused themselves from the case, and the Mississippi Supreme Court appointed a special judge to preside over the proceedings. Several of Smith's beneficiaries filed a motion to intervene in the lawsuit, which the specially appointed judge granted.

Lampkin filed a motion for separate trials on the issues of liability and damages. He also asked the chancellor to stay discovery on damages pending the outcome on the trial as to liability. The chancellor granted Lampkin's motion and bifurcated the trial. The chancellor held a hearing on the issue of liability in November 2009. The main issue before the chancery court was whether Lampkin breached his fiduciary duty to Limestone by usurping a corporate opportunity when he started Delta Stone. In determining whether Lampkin breached his fiduciary duty to Limestone, the chancellor considered the following: (1) whether the business opportunity was "reasonably related to the existing or prospective business activities of the corporation"; and (2) whether the corporation had the financial ability to seize the opportunity. *See Aqua-Culture Tech., Ltd. v. Holly*, 677 So. 2d 171, 183 (Miss. 1996) (Mississippi courts apply a two-part test to determine whether a party has

3

established a prima facie case of conflict of interest arising from a business opportunity in question being a corporate opportunity).

In his order, the chancellor noted Lampkin's concession that the business ventures and activities of Delta Stone and Limestone were the same. The chancellor further noted that Delta Stone operated on the same property as Limestone, used the same facilities and equipment as Limestone, and sold rock to the same customers as Limestone. In determining whether Limestone had the financial ability to seize the corporate opportunity, the chancellor noted that "[t]here is no dispute amongst the parties that the bank would not renew the line of credit without the personal guarantees of both the Estate and Lampkin." The chancellor continued:

> From a review of the documentary evidence, and from listening to the testimony of the parties and their experts, the [c]ourt is not convinced that Limestone could function without the need for the line of credit. However, the [c]ourt is also not convinced that the Estate was given ample information or time to decide whether [it] wanted to renew the line of credit.

In reaching a determination as to Lampkin's liability, the chancellor considered the events that occurred between Smith's death in August 2006 and the December 2006 deadline for renewing the line of credit. Within his discussion of these events, the chancellor provided a summary of the correspondence exchanged by the parties. After reviewing the evidence, the chancellor found that Lampkin failed to timely provide financial information to the Estate and to give the Estate ample time to review Limestone's corporate records. As noted in the chancellor's order, the Estate requested this information to decide whether to provide a guarantee for Limestone's line of credit, and without the requested information, the Estate was unable to make an informed decision prior to the line of credit's expiration.

The chancellor stated that, if the line of credit was crucial to operating Limestone, then Lampkin, who was aware of the upcoming deadline, possessed a fiduciary duty to Limestone to cooperate with the Estate to meet the deadline. The chancellor found that Lampkin's failure to timely provide the necessary financial information to the Estate prevented him from prevailing in his argument that the Estate's failure to renew the line of credit relieved him of any further fiduciary duty to Limestone. According to the chancellor, "[t]he Estate should have been provided more time to make the determination [of whether to guarantee the line of credit], even if that meant allowing the line to

4

mature and letting the line sit for a few more weeks or months while Limestone's documents were inspected."

Although Limestone's balance sheets showed the corporation to be solvent, the chancellor noted that the corporation apparently lacked "a substantial amount of equity with which to continue on with the business." The chancellor found that the line of credit had been Limestone's primary source of funds with which to purchase inventory for the past ten years. He therefore agreed with Lampkin that, without the guaranteed line of credit, Limestone could not continue to operate. The chancellor found that Lampkin was an officer and director of Limestone and thus owed a fiduciary duty to the corporation. By forming Delta Stone, Lampkin breached his fiduciary duty to Limestone. In addition, the chancellor found that Lampkin's failure to timely provide the Estate with the requested financial information hindered Limestone's financial ability to continue its business operations. As a result, the chancellor granted the Executors' motion to dismiss and denied Lampkin's request for declaratory relief.

Following the chancellor's ruling that Lampkin breached his fiduciary duty to Limestone by starting Delta Stone and usurping a corporate opportunity, the parties presented evidence as to the damage that resulted from Lampkin's breach of duty. Both parties hired an expert to testify as to the valuation of Limestone. Lampkin hired Brent Saunders, and the Executors hired James Koerber. The chancellor accepted both experts as certified public accountants and experts in the field of business valuation.

*Lane v. Lampkin*, 2014 WL 4548870, **2-4 (Miss. Ct. App. Sept. 16, 2014)

¶2.    Koerber, expert for Smith's estate, testified at the hearing on damages that Lampkin's construction company, Lampkin Construction, purchased rock from Limestone and that Lampkin's failure timely to pay his bills to Limestone resulted in a growing line of credit. This growing line of credit prevented Limestone's fulfilment of its own obligations and, thereby remaining a viable company. Koerber's expert report indicated that between 2000 and 2007, Limestone's average net income was $20,914.00. Koerber opined that, in total, 649,203 tons of rock were diverted from Limestone between 2003 and 2011. This unreported

5

rock was, beginning in 2007, diverted to Delta Stone: "you've got all of this unreported rock that went through say Delta [S]tone and then some that should have been attributable to Limestone." Based on the unreported rock, Koerber testified that Limestone had incurred lost-profit damages of $1,095,281. Additionally, Koerber calculated that the lost-profit damages from 2011 through 2012 had been $270,804.00, which he based on "the average of 2007, 2008, 2009, and 2010's lost profits." Koerber estimated that lost profits amounted to $1,366,085, which he rounded down to $1,366,000. He then added $169,129 to that figure to account for loss of assets, bringing the total loss to $1,535,129. The chancellor indicated in his valuation order that "the Smith estate's portion, based on Koerber's figures, would be $767,564.50."

¶3.     Saunders, Lampkin's expert, testified that the rock was not "unreported," as Koerber had stated, but that Lampkin had "moved the tons from Limestone to Delta Stone." According to Saunders, the tons of rock "may be unreported in Limestone but we've got a accounting and analysis" which shows that "they just moved over to Delta Stone because [Lampkin] kept on running the thing just like he was doing before." Instead of conducting a lost-profits analysis, Saunders conducted a valuation of the "net book value" of Limestone. As of 2006, the year Smith died, Saunders opined that the net book value was $165,000. The 2007 valuation, according to Saunders, was $156,000. According to the chancellor, "[a]fter deductions, Saunders added the value of the corporation's remaining assets" and "arrived at a total net book value of $125,546.32." Saunders stated that $62,773.16 was owed to the Smith estate.

6

¶4. The chancellor then conducted an independent assessment of the damages, which he chronicled in a Judgment on Valuation of Business. He acknowledged Saunders's calculation of net book value, including deductions, at $125,546.32. He opined that "in making an assessment of lost profits from January 1, 2008[,] forward the more fair assessment of damages would be that of historical lost profits." He then took into consideration Koerber's calculation of average yearly net income of $20,914, multiplied that figure by five, representing the years 2008 through 2012, and concluded that the "historical lost profits" amounted to $104,570. Therefore, "[u]tilizing the net book value provided by Saunders, in addition to the historical costs, the Court finds that the total sum of damages due to Limestone Products totals $230,116.32." The chancellor ordered Lampkin to pay $230,116.32 "as a result of his usurpation of corporate opportunity," or otherwise $115,058.16, in the event the parties reached an agreement to dissolve the corporation. The chancellor denied the executors' request for attorneys' fees, expert-witness fees, and punitive damages.

¶5. Aggrieved, the executors appealed the chancellor's judgment, and the case was assigned to the Court of Appeals. The Court of Appeals affirmed, finding that the chancellor had not abused his discretion in the methods he employed to assess the damages owed to Smith's estate, in determining that Lampkin's expert had accounted for the unreported rock, in failing to award damages based on unpaid rent due to Limestone, and in failing to award costs to Smith's estate. After filing the requisite motion for rehearing in the Court of Appeals, the executors timely filed the present petition for a writ of *certiorari*, which this

Court granted on April 22, 2015. The executors of Smith's estate assert that the chancellor employed the wrong analysis in assessing damages, that the chancellor failed to take into account the unreported rock in assessing damages, that the chancellor failed to award damages based on unpaid rent due to Limestone, and that the chancellor failed to award attorneys' fees, expert-witness fees, and punitive damages to the Smith Estate. We granted *certioriari* to consider the following issues:

I.      Whether the chancellor erred in the accounting methods he employed to calculate damages.

II.     Whether the chancellor failed to take into account Limestone's unreported rock inventory in his calculation of loss of future profits.

III.    Whether the chancellor failed to award damages based on unpaid rent due to Limestone.

## STANDARD OF REVIEW

¶6.    "We 'always review a chancellor's findings of fact, but . . . will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard.'" ***Biglane v. Under the Hill Corp.***, 949 So. 2d 9, 13-14 (Miss. 2007) (quoting ***Cummings v. Benderman***, 681 So. 2d 97, 100 (Miss. 1996)). This Court employs "a de novo standard when analyzing questions of law." ***Id.***

¶7.    In the context of a damages assessment, which is a finding of fact, "the appellate court must review the damages award by looking to the 'facts of each case.'" ***Greater Canton Ford Mercury, Inc. v. Lane***, 997 So. 2d 198, 206 (Miss. 2008) (quoting ***Texaco, Inc. v. Addison***, 613 So. 2d 1193, 1202 (Miss. 1993)). We have held "that '[d]amage awards are

8

only overturned when the trial judge has abused his discretion or 'in exceptional cases where such awards are so gross as to be contrary to right reason.'" ***Id.***

## DISCUSSION

### I. Whether the chancellor erred in the accounting methods he employed to calculate damages.

¶8. The executors claim that the chancellor "abused his discretion in conducting a business valuation, as opposed to a lost profits analysis" and that his "purported lost profits analysis is flawed."

¶9. The chancellor, relying on this Court's decision in ***Lovett v. E.L. Garner***, 511 So. 2d 1346, 1353 (Miss. 1987), held that "in making an assessment of lost profits from January 1, 2008, forward[,] the more fair assessment of damages would be that of historical lost net profits." The chancellor recognized that this Court has acknowledged the propriety of this damage assessment method "in cases of breach of contract." The chancellor multiplied Koerber's estimate of Limestone's average net income of $20,914 by five, representing the five years between 2008 and the date of trial in 2012, to arrive at his calculation of Limestone's "historical lost net profits" of $104,570.

¶10. This Court has stated that "[t]here are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits" and that "the degree of proof required usually depends on the particular facts of the case." ***Lovett***, 511 So. 2d at 1353. "One guideline frequently recognized by this Court is a party's proof of its past profits." ***Id.*** But in that case, Lovett owned a convenience store and Garner sold petroleum products to Lovett. ***Id.*** at 1347. The two men had entered into a contract under which "Garner

9

would pay to Lovett one-half of the net profits on all gasoline Lovett sold to the public, provided that Lovett would be guaranteed a minimum profit of four cents per gallon sold." *Id.* at 1347-48. Because "Garner was not necessarily entitled to one-half of the net profits per month" but "Garner was entitled to what was left over after Lovett received his four cent per gallon guarantee, regardless of whether that constituted one-half of the net profits or not," this Court observed that Garner's projections of future profits on past profits "were misleading and resulted in inaccurate amounts for future profits." *Id.* at 1353.

¶11.    According to the executors of Smith's estate, the lost-profits analysis conducted by the chancellor was flawed: "[p]ast profits would, in no way, be indicative of future lost profits, as they fail to consider any post-breach action by Lampkin, such as the fact that Lampkin greatly increased the price of rock . . . ." Koerber testified that rock prices in 2003 were substantially different from those in 2009:

> [T]he prices in 2003 – well, we will just pick one. Product number 200 it shows the cost was $4.00 a ton and it sold for $11.24. If you take that on across you will see after Mr. Lampkin started [Delta Stone] he greatly increased the prices to as high as $36.21 in 2009 and $34.52 in 2010. And the price did not increase that much, the cost to buy it. It was $4.00 a ton in 2003. It was $6.50 in 2010.

This Court has held that:

> Although recovery of profits may be awarded where one who breaches a fiduciary obligation makes profits in excess of the loss cause[d] by the breach, . . . one who breaches a fiduciary obligation is responsible for the entire loss suffered by the corporation as a result of the breach. This liability is not limited to the recovery of profits or to "out-of-pocket" loss.

*Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 183-84 (Miss. 1996) (quoting *Norte & Co. v. Huffines*, 288 F. Supp. 855, 864 (S.D.N.Y. 1968)).

¶12. The chancellor's assessment of "historical lost net profits" in his damages calculation did not take into account Lampkin's post-breach rock-price increase. And while the chancellor considered "historical lost net profits" on the basis of *Lovett*, which ultimately concluded that use of past profits to determine future profits was misleading, the chancellor offered no explanation for why his assessment of lost profits took into account only the years 2008 through 2012, especially in light of the fact that Delta Stone began operating in January 2007.

¶13. To the "historical lost net profits," the chancellor added "the net book value provided by Saunders" ($125,546.32) and arrived at a "total sum of damages due to Limestone," which he concluded was $230,116.32. Judge Griffis observed in his dissent in the Court of Appeals that "'[n]et book value' is simply an accounting term that is not directly related to the actual value of the corporation's assets. It should not be considered as part of the calculation of damages for a recovery based on the claims of breach of fiduciary duty or usurpation of corporate opportunity." *Lane*, 2014 WL 4548870, at *15 (Griffis, J., dissenting). Judge Griffis further observed that "[t]here is simply no legal authority for the chancellor to consider a business-valuation analysis for a claim of breach of fiduciary duty or usurpation of corporate opportunity." *Id.* We agree.

¶14. In the case of *Aqua-Culture Technologies v. Holly*, this Court considered a shareholder's derivative suit in which corporate officers and directors were alleged to have diverted "expertise, work product and good will" of the corporation into a new corporation, a "duplicate enterprise." *Holly*, 677 So. 2d at 182. This Court affirmed the chancellor's

11

award of damages against the offending officers and directors, citing the rule that "one who breaches a fiduciary obligation is responsible for the *entire loss suffered* by the corporation as a result of the breach." *Id.* at 184 (emphasis added).

¶15.    Business valuation analyses, on the other hand, have been utilized for the purposes of determining a party's interest in a business for purposes of divorce and eminent domain. *See **Gutierrez v. Gutierrez***, 153 So. 3d 703 (Miss. 2014) (divorce); ***Singley v. Singley***, 846 So. 2d 1004 (Miss. 2002) (divorce); ***Dedeaux Utility Co., Inc. v. Gulfport***, 63 So. 3d 514 (Miss. 2011) (eminent domain). Likewise, valuations have been used in cases of shareholder dissension to corporate merger. *See **Richton Bank & Trust v. Bowen***, 798 So. 2d 1268 (Miss. 2001); ***Cal-Maine Foods, Inc. v. Duvic***, 264 So. 2d 383 (Miss. 1972); Miss. Code Ann. § 79-4-13.02 (Rev. 2013).

¶16.    In the present case, the chancellor observed that:

> [T]he experts are just splitting hairs with getting bogged down in an argument over the terminology used to describe the valuation of Limestone Products. Whether you call it asset based or net book value or lost profits, the Court is merely concerned with how and when to value this business.

But Judge Griffis correctly opined that, "[t]he experts were not 'just splitting hairs' or 'getting bogged down'; rather, they were testifying about detailed and important accounting terminology." ***Lane***, 2014 WL 4548870, at *15 (Griffis, J., dissenting). Additionally, the chancellor's attempt "to value the business" is not the appropriate standard. In cases in which a finding of breach of fiduciary duty and usurpation of corporate opportunity has been made, we have held that the offending party is obligated "for the entire loss suffered by the corporation as a result of the breach." ***Holly***, 677 So. 2d at 184.

¶17. The chancellor's calculation of "historical net book value" was misleading because it did not account for a rock price increase after Lampkin's breach, and also because it was, without explanation, based only on the years 2008 through 2012. The chancellor's business valuation ignored our precedent which instructed him to calculate the "entire loss suffered by the corporation" as a result of Lampkin's breach of fiduciary duty and usurpation of corporate opportunity.

¶18. Because the chancellor's erroneous damages assessment in the present case amounted to an abuse of discretion, we reverse and remand.

**II. Whether the chancellor failed to take into account Limestone's unreported rock inventory in his calculation of loss of future profits.**

¶19. The Smith estate's executors argue that the chancellor's failure to take into account Limestone's unreported rock inventory amounted to an abuse of discretion.

¶20. At the hearing on damages, Koerber opined that "unreported rock" was, beginning in 2007, diverted to Delta Stone: "you've got all of this unreported rock that went through say Delta [S]tone and then some that should have been attributable to Limestone." Saunders reported that 154,000 tons of rock "may be unreported in Limestone but we've got a accounting and analysis" which shows that "they just moved over to Delta Stone because [Lampkin] kept on running the thing just like he was doing before." The chancellor agreed with Saunders and found that "Saunders and Lampkin were able to readily account for the allegedly unreported rock." Yet, despite Saunders's agreement with Koerber that Limestone's

13

inventory had been diverted by Lampkin to Delta Stone, the chancellor declined to "take into consideration any purported 'unreported product.'"

¶21. According to *Holly*, the party guilty of a breach of fiduciary duty or usurpation of corporate opportunity is responsible for "the *entire loss suffered* by the corporation as a result of the breach." *Holly*, 677 So. 2d at 184 (emphasis added). We hold that such "entire loss" includes corporate inventory diverted from Limestone to Delta Stone. It is clear that the rock was not accounted for, as the chancellor held, but also that it had been moved by Lampkin from Limestone to Delta Stone. This transfer of corporate assets constituted a breach of Lampkin's fiduciary obligation to Limestone for which he should be held accountable.

¶22. Finding that the chancellor abused his discretion in failing to take into account the unreported rock in his calculation of lost future profits, we reverse and remand.

### III. Whether the chancellor failed to award damages based on unpaid rent due to Limestone.

¶23. In 1999, Lampkin and Smith entered into a lease agreement with Limestone wherein they, as lessors, leased property to Limestone upon which to conduct its corporate operations. The lease obligated Limestone to pay to Lampkin and Smith $4,000 per month, and the term of the lease automatically was "extended for terms of one year each unless at least 90 days prior to the expiration of the then-current lease term written notice is given by either party terminating the lease." If rent "shall remain unpaid for 30 days after same shall have become due and payable and without demand therefor," Lampkin and Smith possessed the right "to repossess itself of said premises" and the lease "shall cease, determine and be utterly void." Ernest Lane, one of the executors of the Smith estate, testified that "in April 2007[,] Mr.

14

Lampkin as President of Limestone Products arbitrarily cancelled the lease and stopped payment."

¶24. The chancellor found that the lease had not been terminated and that "it remains in force and effect between the parties." Further, the chancellor ruled that, because "Lampkin and Smith are equal shareholders in Limestone Products," both "would be equally responsible for lease payments" and, therefore "equally responsible for any lease payments." Ultimately, the chancellor found that "this creates a wash." The Court of Appeals affirmed solely on the basis of the abuse-of-discretion standard of review. *Lane*, 2014 WL 4548870, at *21.

¶25. On writ of *certioriari*, the executors of Smith's estate argue that the chancellor abused his discretion in failing to award damages based on the unpaid rent due to Limestone pursuant to the lease. They posit that the chancellor's failure to take into consideration unpaid rent in his damages award ultimately resulted in piercing the corporate veil of Limestone: "absent any conduct by the Estate that would warrant piercing the corporate veil to its detriment[,] the Chancellor abused his discretion . . . not to award damages based on a valid lease that remained in effect . . . ."

¶26. It is true, as the executors claim, that "[i]t is well settled Mississippi law that a corporation is a separate, distinct entity from its stockholders," *Durham v. Univ. of Miss.*, 966 So. 2d 832, 835 (Miss. Ct. App. 2007) (citing *Ill. Cent. R. Co. v. Miss. Cotton Seed Prods. Co.*, 166 Miss. 579, 589, 148 So. 371 (1933)). Further, "a shareholder of a corporation is not personally liable for the acts or debts of the corporation except that he may become

15

personally liable by reason of his own acts or conduct." Miss. Code Ann. § 79-4-6.22 (b) (Rev. 2013). "Mississippi case law generally favors maintaining corporate entities and avoiding attempts to pierce the corporate veil." *Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1115 (Miss. 2012) (quoting *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007)).

¶27.    Contrary to the executors' argument, however, Lampkin's conduct may have warranted piercing the corporate veil. The chancellor was correct in finding that Lampkin and Smith, as equal shareholders in Limestone, were equally responsible for lease payments and, as lessors to Limestone, equally and individually entitled to one-half of the lease proceeds pursuant to the lease agreement. However, the chancellor failed to take into account that Lampkin's new company, Delta Stone, had been operating on the property subject to Limestone's lease without having paid any rent. It cannot be said, therefore, that the situation is "a wash."

¶28.    On remand, the chancellor should reconsider whether the Smith estate is entitled to lease proceeds from 2007, the time of Lampkin's breach, onward.

**CONCLUSION**

¶29.    The chancellor's damages assessment in the present case was arbitrary and failed to account for rock which Lampkin had diverted from Limestone to Delta Stone. We therefore reverse the judgment of the Court of Appeals. Finding that the damages award amounted to an abuse of discretion, we reverse the judgment of the Chancery Court of Warren County and remand the case for proceedings consistent with this opinion.

16

¶30.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, CHANDLER, KING AND COLEMAN, JJ., CONCUR.  RANDOLPH, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.  PIERCE, J., NOT PARTICPATING.**