# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01597-COA

**PAUL M. NEWTON JR.**                                            **APPELLANT**

**v.**

**RONALD LEE BROWN AND/OR THE ESTATE**               **APPELLEES**
**OF RONALD LEE BROWN, DECEASED, BY**
**BETTY LOU BROWN AND LISA ANN RAZZE,**
**SHEILA RENE BROWN AND DEBRA LOU**
**HOLTON ELLIOTT, AS INDIVIDUAL HEIRS-**
**AT-LAW**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/15/2012 |
| TRIAL JUDGE: | HON. HOLLIS MCGEHEE |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | PAUL M. NEWTON JR. |
| ATTORNEY FOR APPELLEES: | PETER C. ABIDE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | JUDGMENT FOR CONVERSION AND ASSESSMENT OF ATTORNEY'S FEES AGAINST APPELLANT |
| DISPOSITION: | AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AND REVERSED AND RENDERED IN PART: 05/24/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., CARLTON AND JAMES, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.     Paul M. Newton Jr. appeals the judgment of the Harrison County Chancery Court that

found Newton converted the personal property of Dr. Ronald Lee Brown[1] and assessed

---

        [1] Dr. Brown passed away during the litigation.  For simplicity, despite the fact that
Dr. Brown is now deceased, we refer to the Appellees as Dr. Brown.

attorney's fees against him.

## FACTS AND PROCEDURAL HISTORY

¶2.     On November 11, 1986, Dr. Brown, Dr. Arthur Matthews, and Dr. Gerald Wessler[2] entered into a partnership agreement to purchase an office building. The partnership owned two parcels of land, which included a building and its parking lot. The parties referred to this as the BMW partnership.

¶3.     On November 1, 1989, Drs. Brown and Matthews formed a second partnership to conduct their medical practice, the Gulfport Urology Clinic. The parties referred to this partnership as the Clinic.

¶4.     Drs. Matthews and Brown operated the Clinic until 2004. At this time, Dr. Matthews experienced legal issues when it was discovered that he had failed to pay state and federal taxes for a number of years. Dr. Matthews pleaded guilty to two counts of failure to file tax documents. As part of this plea agreement, Dr. Matthews received a sentence of one year and one day in prison and a judgment against him in the amount of $284,543. The federal government filed a judgment lien in that amount against Dr. Matthews's property, which included the BMW-partnership property. Due to these legal issues, Drs. Brown and Matthews agreed to dissolve both partnerships.

¶5.     Drs. Brown and Matthews agreed that the Clinic partnership would end effective December 31, 2004. They executed a dissolution agreement on February 11, 2005. The agreement provided that Dr. Matthews would receive monies due to him from the Clinic

---

[2] Dr. Wessler left the partnership prior to the events that led to this lawsuit.

2

practice. It also provided that Dr. Brown would collect Dr. Matthews's outstanding accounts through 2005 and remit these funds to Dr. Matthews, less a five-percent collection fee. Further, the Clinic owned a life-insurance policy that insured both Dr. Matthews and Dr. Brown. The agreement stipulated that the Clinic would turn in the policy for its cash-surrender value, which would result in the payment of $49,771.71 to each doctor.

¶6. The dissolution agreement for the BMW partnership stated that Dr. Brown would purchase the building and parking lot for one-half of the market value of the property, which was $195,600. At the time of dissolution, Drs. Brown and Matthews were aware of a state tax lien against the property in the amount of $75,677.97. The parties also agreed to reduce Dr. Matthews's proceeds by that amount. On January 7, 2005, Dr. Matthews executed the dissolution agreement for the BMW partnership and a quitclaim deed that conveyed the property to Dr. Brown.

¶7. To complete the necessary transactions that resulted from the dissolution of the BMW partnership, Dr. Brown prepared two checks. The first check was to the Mississippi State Tax Commission in the amount of $75,677.97 to satisfy the state tax lien. The second check was payable to Dr. Matthews for the remainder of the dissolution proceeds, in the amount of $119,922.04. Stephen Maggio, the attorney who represented Dr. Brown, retained the check to the Mississippi State Tax Commission. Dr. Matthews negotiated his check.

¶8. Thereafter, Maggio did not forward the check to the Mississippi State Tax Commission. Also, the parties learned that Maggio incorrectly drafted the quitclaim deed, because he left out the parking lot from the property description. Further, Maggio failed to

record the quitclaim deed and subsequently lost the deed. Then, on February 4, 2005, Dr. Brown learned that Maggio did not find or disclose the judgment lien on the property at the time of conveyance.

¶9. On February 7, 2005, David Blakeslee, an accountant for the Clinic partnership, called Newton. Newton had served as the attorney for Dr. Matthews throughout the dissolution process. Blakeslee told Newton that two checks were ready for Dr. Matthews.

¶10. First, a check was payable to Newton[3] in the amount of $55,730. This check was for Dr. Matthews's portion of the Clinic partnership's liquid assets. This check was drawn on an account in the name of the Clinic partnership at Hancock Bank (Hancock Bank check).

¶11. The second check was also payable to Newton in the amount of $49,771.71. This check was for payment of Dr. Matthews's share of the insurance proceeds from the surrender of the Clinic's life-insurance policy. This check was drawn on an account in the name of the Clinic Partnership at A.G. Edwards (A.G. Edwards check).

¶12. Newton and Blakeslee met to resolve this matter. During their meeting, Blakeslee left the room, and Newton took both checks, a folder, and papers and placed them in his car. Blakeslee demanded that Newton return the checks because Dr. Brown wanted to retain the money to offset the federal judgment lien that neither Dr. Matthews nor Newton had previously disclosed. Newton refused to return the checks. Newton negotiated the Hancock Bank check and attempted, but failed, to negotiate the A.G. Edwards check.

¶13. That same day, Dr. Brown filed a complaint in Harrison County Chancery Court. The

_____

[3] Both checks were payable to Newton in his representative capacity for Dr. Matthews, because Dr. Matthews was incarcerated at that time.

4

complaint sought to enjoin Newton or Dr. Matthews from disposing of the funds and to return the checks to Blakeslee. Two days later, the chancellor issued an ex parte temporary order that enjoined Dr. Matthews and Newton from expending the funds. Then, on February 16, 2005, the chancellor entered another order, titled as a temporary restraining order, that replaced the prior order. Later, Dr. Brown filed an amended complaint that sought damages based on Dr. Matthews's breach of his duty to Dr. Brown as a partner and Newton's actions regarding the funds.

¶14. After several years of litigation, the chancellor heard this matter from February 6 to February 10, 2012. Then, on February 23, 2012, the chancellor issued his findings of fact and conclusions of law. The chancellor found Dr. Matthews violated his partnership duties to Dr. Brown, and that Maggio committed simple negligence regarding the Mississippi State Tax Commission check and the quitclaim deed. The chancellor also determined that both the Hancock Bank and A.G. Edwards checks belonged to Dr. Brown, individually. The chancellor further held that Newton converted the funds when he cashed the Hancock Bank check, his intentional and wrongful act warranted a finding of punitive damages, and his actions necessitated an assessment for attorney's fees in the amount of $113,462.83.

¶15. On March 5, 2012, Newton filed a motion to reconsider. The motion was denied by order dated April 30, 2012. On March 13, 2012, Newton also filed a motion to transfer the case to the circuit court. On April 17, 2013, the chancellor then issued an order and amended findings of fact and conclusions of law, which clarified an application of law but left the judgment the same. On April 17, 2013, Newton filed another motion to reconsider the April

5

17, 2013 order. The chancellor denied Newton's second motion to reconsider and motion to transfer on October 28, 2014.

¶16. Newton filed his notice of appeal on November 10, 2014. The notice of appeal indicated that Newton appealed the April 17, 2013 judgment, as well as the February 6, 2012 order denying summary judgment, the February 23, 2012 order, the April 30, 2012 order, and the October 28, 2014 order.[4] It is from these judgments that Newton now appeals.

## ANALYSIS

### I. Whether the chancellor erred by refusing to transfer the case to circuit court.

¶17. Newton has raised a jurisdictional challenge. He argues that the chancellor should have transferred the case to the circuit court because Dr. Brown's claims did not fall under the specific jurisdiction of the chancery court. Dr. Brown responds that the chancery court properly exercised jurisdiction over the claims.

¶18. "The standard of review for a ruling on a motion to transfer from chancery court to circuit court, or vice-versa, for lack of subject-matter jurisdiction is . . . de novo." *Germany v. Germany*, 123 So. 3d 423, 427 (¶8) (Miss. 2013) (citing *Union Nat'l Life Ins. v. Crosby*, 870 So. 2d 1175, 1178 (¶2) (Miss. 2004)). "[A] question of subject matter jurisdiction may be presented at any time." *Gale v. Thomas*, 759 So. 2d 1150, 1159 (¶39) (Miss. 1999) (citing M.R.C.P. 12(h)(3) cmt.).

---

[4] Dr. Brown filed a motion to docket and dismiss this appeal with the Mississippi Supreme Court on June 4, 2015. Dr. Brown argued that Newton's appeal was untimely because Newton ultimately challenges the February 23, 2012 judgment, not the April 17, 2013 order. The supreme court denied the motion on June 24, 2015.

6

¶19.   Newton primarily contends that the conversion claim against him required a transfer of his claim to circuit court.  "A declaration setting forth a cause of action based on the tort theory of conversion is an action at law, and is to be pursued in the circuit rather than chancery courts."  *Ga.-Pac. Corp. v. Blakeney*, 353 So. 2d 769, 772 (Miss. 1978).  Conversion, however, was not Dr. Brown's only claim.

¶20.   "[I]f there is one issue of exclusive equity cognizance, that 'issue can bring the entire case within subject matter jurisdiction of the chancery court and that court may proceed to adjudicate all legal issues as well.'"  1 Jeffrey Jackson et al., *Mississippi Civil Procedure* § 1:1 (2015) (citing *Re/Max Real Estate Partners Inc. v. Lindsley*, 840 So. 2d 709, 711-12 (¶13) (Miss. 2003)).  In addition to conversion, Dr. Brown asserted claims for breach of fiduciary duty, a permanent injunction, to quiet title on the BMW property, an accounting, punitive damages and attorney's fees, and other equitable relief.  "Claims regarding title, possession[,] and use of land are well within the chancery court['s] subject matter jurisdiction."  *Johnson v. Hinds Cty.*, 524 So. 2d 947, 952 (Miss. 1988) (citations omitted).  Dr. Brown asserted claims that vested jurisdiction in the chancery court, and the chancellor did not err in retaining jurisdiction.  In addition, we note that Newton did not raise this issue until posttrial motions.  Therefore, this issue is without merit.

### II.   Whether the chancellor erred in finding Newton converted Dr. Brown's property.

¶21.   Newton contends that the chancellor erred when he decided that Newton was guilty of conversion.  Here, Newton argues that Dr. Brown failed to prove that he was the true owner of the property.  If Dr. Brown, individually, did not own the property, then Newton

7

contends that he could not convert Dr. Brown's property.

¶22. The chancellor found that the Hancock Bank and A.G. Edwards checks belonged to Dr. Brown and Newton's actions regarding the checks constituted conversion. "This Court has a limited standard of review with regard to a chancellor's findings of fact. We will affirm a chancellor's findings unless they are clearly erroneous, manifestly wrong, or an erroneous legal standard was applied." *Thweatt v. Thweatt*, 4 So. 3d 1085, 1088 (¶9) (Miss. Ct. App. 2009) (citing *Sanderson v. Sanderson*, 824 So. 2d 623, 625-26 (¶8) (Miss. 2002)). "A finding of fact is considered clearly erroneous when, even though there is evidence to support the finding, the reviewing court has a firm belief a mistake has been made." *Id.* (quoting *Milligan v. Milligan*, 956 So. 2d 1066, 1071 (¶11) (Miss. Ct. App. 2007)). "However, if a chancellor's findings of fact are supported by substantial evidence, broad discretion is given to support [his] determination." *Id.*

¶23. "Conversion requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987) (citation omitted). "Ownership of the property is an essential element of a claim for conversion." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 68 (¶50) (Miss. 2004). Therefore, this Court must determine if the evidence sufficiently showed that Dr. Brown was the true owner of the Hancock Bank and A.G. Edwards checks and the funds disposed of by Newton.

¶24. The chancellor determined that the checks belonged to Dr. Brown and, as such, Dr. Brown had the right to retain the checks. While Dr. Brown did sign the checks, the checks

8

themselves were drawn on two accounts owned by the Clinic partnership and contained funds of the Clinic partnership. "Property acquired by a partnership is property of the partnership and not of the partners individually." Miss. Code Ann. § 79-13-203 (Rev. 2013). The Hancock Bank check represented liquid assets from the Clinic partnership. Also, the Clinic owned the life-insurance policy that constituted the $49,771.71 cash-surrender-value amount in the A.G. Edwards check.

¶25. Further, the dissolution of the Clinic partnership did not commence until February 11, 2005. Thus, at the time of the February 7, 2005 incident, the Clinic partnership remained in place. Further, even if the dissolution started as of December 31, 2004, the dissolution of a partnership does not terminate a partnership; rather, a partnership remains until the winding up of business is completed. Miss. Code Ann. § 79-13-802(a) (Rev. 2013). Thus, the checks and funds were arguably property of the Clinic partnership.

¶26. Alternatively, the funds belonged to Dr. Matthews individually. The amount from the Hancock Bank check represented Dr. Matthews's share of the liquid assets of the Clinic partnership. Under Article X of the Clinic partnership agreement, upon dissolution of the Clinic partnership, Dr. Matthews was entitled to his share of the capital account, his accounts receivable, and his compensation. Further, the Uniform Partnership Act (UPA) states:

> Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, profits and losses that result from the liquidation of the partnership assets must be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. A partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account but excluding from the calculation charges attributable to an

9

obligation for which the partner is not personally liable under Section 79-13-306.

Miss. Code Ann. § 79-13-807(b) (Rev. 2013). Therefore, under the UPA and the Clinic partnership agreement, the funds could belong to Dr. Matthews.

¶27. Regardless, Newton did commit an egregious act by removing the checks without authorization from either Blakeslee or Dr. Brown. The checks were not properly delivered to Newton so that Newton could freely negotiate the Hancock Bank check or attempt to negotiate the A.G. Edwards check. *See* Miss. Code Ann. § 75-3-203(a) (Rev. 2002) ("An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."). The evidence, however, fails to establish that the checks or the funds belonged to Dr. Brown individually. Therefore, this case is reversed and remanded for a determination of the true owner of the Hancock Bank check, the A.G. Edwards check, and the funds disposed of by Newton.

> ### III.  *Whether the chancellor erroneously awarded attorney's fees to Dr. Brown.*

¶28. Newton lastly argues that the award of attorney's fees was in error. However, because this Court finds that the chancellor erred in determining that the Hancock Bank and A.G. Edwards checks constituted personal property of Dr. Brown, the judgment of attorney's fees against Newton for conversion is reversed.

¶29. **THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT, IS AFFIRMED IN PART, REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION, AND REVERSED AND RENDERED IN PART. ALL COSTS OF**

**THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEES.**

**LEE, C.J., CARLTON, WILSON AND GREENLEE, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., ISHEE AND FAIR, JJ., NOT PARTICIPATING.**