# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00373-COA

| | |
|---|---|
| **P.P.R., L.P., H.K. ROBERTSON AND ASSOCIATES, INC., BRIARWOOD ONE OFFICE CENTER, LLC, COLONIAL MART RETAIL, LLC, DAVID C. ROBERTSON, TRIAD BUSINESS CENTERS, INC. AND MID-SOUTH REALTY SERVICE, INC.** | **APPELLANTS/ CROSS-APPELLEES** |

**v.**

| | |
|---|---|
| **BRYAN K. ROBERTSON** | **APPELLEE/ CROSS-APPELLANT** |

| | |
|---|---|
| DATE OF JUDGMENT: | 03/05/2024 |
| TRIAL JUDGE: | HON. TAMETRICE EDRICKA HODGES |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | CHADWICK MITCHELL WELCH C. MAISON HEIDELBERG MARY R. ARTHUR |
| ATTORNEY FOR APPELLEE: | STEVEN H. SMITH |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: REVERSED AND REMANDED - 03/10/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. When their family business began to crumble, one brother sued the other who managed the company. He claimed his older brother had committed fraud on him and the company and breached his fiduciary duties. He sought title to the business assets and money

damages.

¶2.    After a multi-day trial, the chancellor found the managing brother liable for losses suffered by his younger brother and the business.  The chancery court ordered the business to wind down and the younger brother to receive substantial damages and attorney's fees.

¶3.    On appeal we find sufficient evidence supported the chancery court's finding as to breach of fiduciary duty and affirm in part.  However, because the court's orders contain an error regarding the percentage of the business owned by each brother and the court's award of attorney's fees is not supported by the record, we reverse and remand in part.

## BACKGROUND

¶4.    This case stems from a dispute between two brothers, David Robertson and Bryan Robertson, over their family business.

¶5.    P.P.R., L.P is a limited partnership that was established primarily for investing in commercial real estate. PPR was formed in 1998 by David and Bryan's parents. Later, the parents transferred their interest in PPR equally to their 3 children—David, Bryan, and Michael.[1]

¶6.    PPR has one general partner and two limited partners. H.K. Robertson and Associates, Inc. is a separate business entity that serves as the general partner of PPR. Until 2010, David and Bryan's father was the president of the corporation and the general partner of PPR. But

---

[1] In 2013, Michael made a deal to sell his interest in PPR in equal halves to David and Bryan. He is not a party to this lawsuit.

2

when their father passed away in 2010, David took over as president and became the acting general partner of PPR. David was HKRA's president when this dispute arose, and had been for about 8 years. David was also a limited partner. In contrast, Bryan was solely a limited partner.[2]

¶7.     At the start of 2018, PPR's portfolio consisted of four core assets: a 100% interest in Briarwood One Office Center LLC, approximately 230 acres of real property in Rankin County, a 34.5% membership interest in Rankin County Parkway Properties LLC, and a 44.74% interest in Colonial Mart Retail LLC.[3]

¶8.     Briarwood One Office Center LLC was a business entity that operated a building called the Briarwood office building. The five-story office building was located in Jackson, off Interstate-55 at Frontage Road and Briarwood Drive and was acquired by PPR in 2006 for $7,500,000.

¶9.     David also solely owned and operated several other companies, including Triad Business Centers Inc. and Mid-South Realty Service Inc.

¶10.    In December 2014, David entered into a ten-year lease agreement between Briarwood

---

[2] The general partner has a 1% interest in PPR and the two limited partners each have a 49.5% interest in PPR. As general partner, the corporation has a 1% interest in PPR. That interest is effectively held by David as the acting general partner. As a limited partner, David also has a 49.5% interest in PPR individually. Bryan has a 49.5% interest in PPR as a limited partner.

[3] Colonial Mart Retail, LLC, is a separate and distinct corporation that operated the Colonial Mart shopping center. During the course of this litigation, the shopping center building was sold and is no longer in PPR's portfolio of assets.

3

LLC and Triad for Triad to lease space in the office building. Shortly after, in January 2015, David entered into a lease agreement between Briarwood LLC and Mid-South for Mid-South to also lease space in the office building. Then in July 2015, David entered into a management agreement between Briarwood LLC and his company Mid-South, for Mid-South to provide management services for the Briarwood building. David signed on behalf of both entities in all three of these agreements.

¶11. Around July 2015, David caused the Briarwood office building to be refinanced. Two years later, in October 2017, David stopped making payments on Briarwood's refinanced note, unbeknownst to Bryan, who had very little to do with the day-to-day operations of PPR.

¶12. As a result of nonpayment, the lender ended up suing Briarwood, and the office building was put into a receivership. The Briarwood building was ultimately purchased from PPR by the lender in July 2018.

¶13. As the situation with the Briarwood building began to escalate, Bryan requested financial records from David for the PPR, Briarwood, and Colonial entities. David responded and provided documentation. Bryan was not satisfied with the information David gave him, however, and became increasingly frustrated with David's stewardship of the family partnership.

**PROCEDURAL HISTORY**

¶14. Bryan brought this lawsuit in April 2018, seeking an accounting and equitable relief. In his original complaint, he alleged that "significant questions have arisen regarding the

4

financial management by Defendant David C. Robertson of P.P.R., L.P., and its related companies." Bryan requested the chancery court to order "a third party forensic accounting . . . of the finances of the Defendant companies, paid for from the funds of P.P.R., L.P."

¶15.   And then "[f]ollowing completion of the forensic accounting requested herein, for an order of restitution by any Defendant to P.P.R., L.P. and/or the Plaintiff for any funds found to have been improperly transferred, conveyed, or improperly withdrawn or diverted from partnership funds," and "for an order removing David C. Robertson as General Partner of P.P.R., L.P. and appointing Plaintiff as General Partner of P.P.R., L.P."

¶16.   Sometime after filing the complaint, Bryan's attorney hired an accounting firm to examine the documents David had produced.[4] In February 2019, a certified public accountant named Cecil Harper provided his report to Bryan. In that report, the CPA advised that "[t]he QuickBooks files provided for PPR, Briarwood One, and Colonial Mart cover more than thirteen years of activity with tens of thousands of transactions."

¶17.   The CPA found that "576 checks were written directly to David C. Robertson individually . . . while 200 deposits were received from him." In contrast, "only 36 checks were written directly to Bryan K. Robertson while 7 deposits were received from him during the same timeframe."

¶18.   Additionally, the CPA reported that "charges and disbursements to David C.

_____

[4] The accounting firm hired was named Harper, Rains, Knight, and Company.

5

Robertson and his related business . . . lack adequate substantiation or transparency necessary to determine its valid business purpose." In the CPA's view, there was a staggering amount of "adjustments" in the financial documents, with "more than 300 adjusting journal entries or account adjustments," and

> most are without documentation or explanation and **unusual at best**. The volume of these **very unorthodox** and unexplained adjusting journal entries only adds to the unnecessary complexity of the accounting and gives the appearance that assets were being transferred between entities with no business purpose.

(Emphasis added).

¶19. The accountant recounted another unusual situation when he discovered "more than 40 checks written to Ms. Jackie M. Franco, an associate of Mr. David C. Robertson[.]" And the "checks written to Ms. Franco from Briarwood One were often wrongly charged to owner's equity despite Ms. Franco having no ownership interest in Briarwood One at any point." The evidence would later establish Franco was David's girlfriend.

¶20. The report repeatedly noted, "Very few transactions have descriptions or memos" in the software, and "[a]greements to support the business purpose of transactions were not provided for many of the charges, disbursements, credits and receipts between David C. Robertson and his related business entities despite multiple requests."

¶21. In the CPA's expert opinion,

> [t]he accounting of PPR/Briarwood One was not maintained in accordance with accepted industry accounting practices. The transactions, the overall accounting and specific accounting activity between PPR/Briarwood One/Colonial Mart and David C. Robertson and his related business entities

6

> are **extremely questionable and unorthodox**, both in nature and in volume. Further, the lack descriptive information within the provided QuickBooks files and the sporadic and inconsistent nature in which bank reconciliations are completed suggest an **unconventional understanding of accounting knowledge** and QuickBooks functionality.

(Emphasis added). The CPA later supplemented his initial report with an itemized "breakdown of unsubstantiated charges and disbursements."

¶22. Based on the information gained in the forensic accounting report, Bryan filed an amended complaint in April 2019. His amended complaint asserted 11 claims for relief, which included: an accounting, breach of fiduciary duties, breach of limited partnership agreement, fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, fraudulent concealment, conversion, unjust enrichment and constructive trust, gross negligence, and negligence. We limit our discussion to only those claims relevant to the issues on appeal.

¶23. Bryan contended "David Robertson has repeatedly breached [his] fiduciary duties through his misappropriation of PPR assets, his self[-]dealing, his mismanagement of PPR assets, and his failure to properly maintain PPR's records."

¶24. In his complaint, he contended David "wrote 576 checks to himself" and "frequently transferred funds between himself and the Defendant entities [including PPR] for no legitimate business purpose." Further, a "net total" of "$1,577,172" in funds was "disbursed to David Robertson and his companies," but "the records provided [by David] do not substantiate" that the money was "for a legitimate business purpose." Bryan claimed that

"[i]n sum, without any authority or justification, David Robertson, Mid-South Realty, and Triad took out between $313,507 and $1,577,172 more than they put in to PPR, Colonial Mart, and Briarwood One."

¶25.    According to Bryan, over a six-year period, "PPR received almost $1,400,000 from the sale of its dirt, timber, and land," which was "expended to cover losses caused by David Robertson's mismanagement of PPR's other assets." He took issue with the fact that "[t]hese funds were not [instead] distributed to Bryan Robertson and David Robertson as the partners of PPR."

¶26.    Also, it was alleged that David's "management company, Mid-South Realty, failed to recruit and retain an adequate number of tenants" for "the Briarwood One office building and the building operated at a loss." David's other company, "Triad[,] failed to make its monthly rent payments in full to Briarwood One," and then "stopped making payments" altogether. Consequently, "[t]he lender filed suit[,]" "the building was placed in receivership[,]" and "[t]he lender purchased the building in July 2018" for "approximately $5,400,000."

¶27.    Next, Bryan claimed "David Robertson had a duty as a limited partner of PPR and as acting general partner to communicate material facts known to him to Plaintiff." He argued David violated this duty and "intentionally misappropriated PPR assets, mismanaged the assets, engaged in self-dealing, and failed to disclose partnership records as required of him by the LPA agreement."

8

¶28. Bryan attempted to argue that David's "silence was effective representation that David Robertson was performing the duties of care and loyalty imposed on him as a limited partner and de facto general partner of PPR;" his "representations were false;" and he "knew these representations were false and intended that his silence and withholding of the records would prevent Bryant Robertson from finding out about his fraudulent actions." Bryan insisted having "no knowledge of David Robertson's fraudulent actions and relied on David Robertson's representations."

¶29. In the end, Bryan insisted that David, "individually and through companies he controls, has caused catastrophic financial damage to the partnership and Plaintiff." To put it in his words, "PPR had to forfeit arguably its most valuable asset (Briarwood One [office building]); the nearly $1,400,000 in proceeds that PPR received from dirt, timber, and land sales are lost; and . . . David Robertson, Mid-South Realty, and Triad owe PPR/Colonial Mart/Briarwood One somewhere between $313,507 and $1,577,172."

¶30. In turn, the defendants filed their answer, raising a series of affirmative defenses and asserting a counterclaim. The counterclaim alleged that Bryan "has willfully refused to sit down with the family limited partnership CPA and David Robertson to answer and all questions before this lawsuit was filed," and "is attempting to come into this Honorable Court, a court of equity, with unclean hands[.]" Therefore, the defendants requested that the chancery court dismiss Bryan's amended complaint.

*Trial on the Merits*

9

¶31. After Bryan's amended complaint was filed, there was a gap of nearly two years before a trial on the merits occurred. During this two-year period, both sides filed a substantial number of motions, and at least 7 different pre-trial hearings were conducted covering an array of issues.[5]

¶32. Bryan's amended complaint was eventually brought on for a bench trial in December 2020. The trial on the merits lasted two days. On the first day, the chancery court heard testimony from Cecil Harper, the CPA hired by Bryan, and from Brandy Partridge, an office manager for David's company Mid-South. On day two of the proceedings, the chancellor heard testimony from Bryan and David.

¶33. At the beginning of the second day's proceedings, Bryan's counsel informed the chancellor that he "had intended to put in proof of accounting fees that Mr. Bryan Robertson had paid to date or that he owes and proof of attorney fees that he had paid and/or owes," as part of the litigation. However, he relayed that defense counsel "asked whether or not [the chancellor] might want to bifurcate that depending on how the Court rules," and raised the question to the chancellor. The chancellor ruled from the bench as follows: "Why don't we

_____

[5] At a pre-trial hearing in March 2020, Bryan's counsel sought an injunction against David to prevent him from taking any further actions on behalf of PPR. Counsel introduced into evidence the CPA's accounting report, as well as testimony from the CPA himself. The chancery court allowed several other financial documents to be entered into the record at that time too. The evidence introduced at this pre-trial hearing, including "the transcript from the previous hearings," was later "incorporate[d] . . . into the record" at trial. The chancellor advised that "the testimony that's been previously heard would be a part of the record," and so would "the exhibits [that] got into evidence[.]"

do that in the interest of completing the merits, so . . . . For the record, I'll make a ruling that we'll reserve the issues of the accounting fees and the attorney fees until then conclusion of the hearing and after the Court makes its decision. . . . And then if the Court rules in favor, then we will have the hearing related to those, and if not, well, that will resolve it." Bryan's counsel responded in affirmation, "We'll bifurcate it." As such, the parties continued with the proceedings after the court bifurcated the trial.

*Chancery Court Orders*

¶34. After trial concluded, the chancery court entered several orders. Some of the orders overlap, and entries of the orders spanned a three-year period.[6]

¶35. In the three years after trial, there were at least 18 post-trial motions filed, 8 post-trial hearings conducted, and at least 13 post-trial orders from the chancery court. Because only 6 of the orders are dispositive of this appeal, we focus our review accordingly.

**A. February 2021 Order – Liability**

¶36. The first post-trial order was entered in February 2021.[7] In this order, the chancellor effectively addressed the "liability" aspect of Bryan's claims for relief. The chancellor found:

David and/or other defendants breached the PPR . . . operating agreements and

---

[6] The chancellor who presided over the trial continued to be involved in the case for another 2 years after trial before retiring in December 2022.

[7] The chancellor characterized Bryan's requested relief as follows: (1) "David should be removed as general partner of PPR;" (2) "all of the Defendants required to provide a full accounting to Plaintiff;" (3) "damages awarded to Plaintiff;" (4) "PPR dissolved with assets distributed to Plaintiff;" and (5) "a constructive trust declared as to all of David's property interest in PPR[.]"

11

fiduciary duties contained in M.C.A. §§ 79-14-409 . . . when he/they (1) collected rent from Triad subleases and did not pay Briarwood; (2) failed to pay rent to Briarwood in the amount of $384,544.79 over a two (2) year period of time; and (3) obtained over $780,000 in PPR dirt and timber proceeds from the Rankin County property without any verification/substantiation at that time as to where or how these proceeds were spent.

¶37. Further, this order addressed PPR's Limited Partnership Agreement and found that David breached two different sections. First, because he "did not put all funds at all times into 'separate federally insured depository institution account or accounts.'" Second, because PPR's "books were not 'kept on the cash basis of accounting for the Partnership's accounting year.'"

¶38. Consequently, the chancellor ordered the following:

1. A full accounting between Bryan and the defendants within forty-five (45) days of entry of this judgment.
2. [A]n accounting to determine damages, if any, sustained by Bryan as a result of the defendants' alleged actions/omissions/failures which constitute a breach of fiduciary duties and the breach of the limited partnership agreement.
3. Dissolution of PPR and distribution of PPR assets as determined.

The defendants filed their court-ordered accounting the following month.

### B. August 2021 Order – Constructive Trust

¶39. The second pertinent order from the chancery court was entered in August 2021. In that order, the chancellor granted Bryan partial equitable relief by imposing a constructive trust to hold PPR's remaining assets.

### C. January 2022 Order – Fraud

¶40. The chancery court then entered an order in January 2022 in response to a motion by

one of the parties requesting more specific, detailed fact-findings regarding its prior orders. In rendering this order, the chancellor ended up making a new finding of fact for the first time in the course of this litigation—that "the plaintiff alleged fraud" and "demonstrated the existence, method of operation, and receipt of monies by Triad intended to pay for notes, maintenance, *et cetera*, of Colonial Mart, *et al*, to a standard of clear and convincing evidence." The chancellor then listed the elements of fraud and made brief findings as to each element.

### D. September 2022 Order – Winding Up Creditor Claims of PPR

¶41. Then in September 2022, the chancery court entered an order regarding the winding up of PPR as a limited partnership.[8] The chancellor examined each of the 7 creditor's claims filed against PPR and denied all except one. "Attorney Wood presented documents evidencing the services performed for Defendant Robertson and PPR from a lawsuit in 2018," and the "debt PPR owes him, ($15,878.60) shall be paid via funds in the Court registry."

¶42. Also in this order, the chancellor addressed for the first time the "Distribution of Remaining Assets & Damages as Attorney Fees." Here, the order provides, the chancery

---

[8] As recounted by the chancellor, "Early on in the litigation process, 107.85 acres of real property located in Rankin County were sold and the proceeds from the sale of the property were paid into the registry of the Chancery Court." And "[a]pproximately 63 acres were sold for a purchase price of $260,000, in October 2021, to satisfy the debt PPR accumulated on this property and in an effort to continue to wind up the limited partnership."

court "seeks a suitable remedy in addition to the dissolution and subsequent winding up of PPR." However, "damages are unascertainable," and "[i]n this case, future profits cannot be proven with any reasonable certainty."

¶43.    The chancellor found, "PPR seemingly lost profits after H.K. Robertson passed away and there can be no projection of future profits because of sloppy bookkeeping and inadequate evidence of past profits. In addition to the limited information that could possibly verify profits, Jackson, Mississippi's housing and retail office space does not reflect a bustling industry. Simply put, PPR's business model did not pan out." Therefore, "the [c]ourt has an inherent inability to assess the damages."

¶44.    Nevertheless, "[i]n spite of the lack of available registry fun[d]s, the [c]ourt determined that appropriate relief based on the present facts would be to provide some form of attorney fees to the Plaintiff to reimburse him for the cost of the litigation."

¶45.    After taking over this case in December 2023, the successor chancellor conducted a hearing on Bryan's request for attorney's fees. During this hearing, the chancellor accepted the parties' stipulation that PPR's remaining assets consisted of 36 acres of Rankin County land, 34.5% interest in Rankin County Parkway Properties LLC, and $59,789.35 in the court registry. The chancellor then entered two orders that are both critical to this appeal.

### E.    December 2023 Order – Attorney's Fees and Damages

¶46.    The successor chancellor's initial order entered in December 2023 found that Bryan requested "the total amount of $190,951.96" for fees incurred in this litigation. The

14

chancellor then referred to the prior hearing and found, "This Court previously determined, on December 14, 2023, that the Plaintiff is entitled to $180,000 in attorney fees." However, the order further stated, "The [c]ourt now modifies its initial award of attorney fees in the amount of $180,000 to $130,000.00."

¶47. It was also found that "[t]he loss to PPR is substantial" and that "Plaintiff is entitled to actual damages in the amount of $91,760.57." The chancellor explained, "This figure is based on the Plaintiff's 44.9% interest in PPR," and the combined "total of $1,263,665.26 in unsubstantiated charges and disbursements" with the "$780,000 in PPR dirt and timber proceeds[.]" As will be discussed below, the actual interest held is 49.5%.

¶48. Lastly, the chancery court ordered "[t]he remaining funds in the Court Registry, in the amount of $59,789.35, shall be given to Plaintiff Robertson, towards his attorney fees. Of the assets held in constructive trust for the benefit of the Plaintiff, 44.9% [sic] shall be given to the Plaintiff."

F.      March 2024 Order – Amended Attorney's Fees and Damages

¶49. The chancery court then amended that order on March 5, 2024. "Due to the Court's clerical error regarding the award of damages, the Court will now reinstate its initial award of attorneys' fees and correct its clerical error in its determination of damages." Without further explanation, the chancellor "reinstate[d] its initial award of attorney fees in the amount of $180,000." And then the order found that "Plaintiff is entitled to actual damages in the amount of $917,605.70," which was "based on the Plaintiff's 44.9% [sic] interest in

15

PPR."

¶50. The chancellor further amended the findings regarding property distribution, now ruling, "The Plaintiff shall receive 44.9% [*sic*] of the remaining funds in the Court Registry, in the amount of $26,845.41." But the court maintained that, "Of the assets held in constructive trust for the benefit of the Plaintiff, 44.9% [*sic*] shall be given to the Plaintiff."

¶51. Aggrieved, David appeals the chancery court's final judgment as well as the prior rulings incorporated via its final judgment. Bryan cross-appeals, aggrieved by the chancellor's mathematical calculations.

## STANDARD OF REVIEW

¶52. We "review[] a chancellor's findings of fact under an abuse of discretion standard of review." *Griffith v. Griffith*, 997 So. 2d 218, 222 (¶13) (Miss. Ct. App. 2008). This Court "will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused [her] discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Soffra v. Shieldsboro Dev. Inc.*, 314 So. 3d 129, 139 (¶34) (Miss. Ct. App. 2020) (quoting *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007)). "A finding of fact is considered clearly erroneous when, even though there is evidence to support the finding, the reviewing court has a firm belief a mistake has been made." *Newton v. Brown*, 198 So. 3d 1284, 1289 (¶22) (Miss. Ct. App. 2016).

¶53. In contrast, "we review legal determinations de novo[.]" *Boatright v. A & H Techs.*

16

*Inc.*, 296 So. 3d 687, 695 (¶27) (Miss. 2020) (quoting *Scafidi v. Hille*, 180 So. 3d 634, 645-46 (¶29) (Miss. 2015)).

## DISCUSSION

¶54.　David raises a multitude of issues with the chancery court's rulings. We affirm as to the chancery court's findings that David breached his fiduciary duty. However, due to systemic error in the rulings on damages and attorney's fees, we must reverse and remand as to the extent of recovery. But because we find reversal is required on two grounds, we "only address those allegations that are necessary for the disposition of this case." *Gary E. White Att'y P.A. v. Blackwell*, 96 So. 3d 733, 738 (¶6) (Miss. Ct. App. 2011).[9]

¶55.　The issues we address are as follows:

> I.　　Whether the chancery court erred in finding David liable for his actions as general partner.
> II.　　Whether the chancery court erred in computing damages.
> III.　Whether the chancery court erred in awarding attorney's fees.
> IV.　Whether the chancery court erred in dissolving PPR.
> V.　　Whether the chancery court erred in denying David's counterclaim.
> VI.　Whether the chancery court erred in denying David a new trial.

---

[9] In his appellate brief, David raises 7 assignments of error, contending that the trial court: (1) "erroneously found David breached a fiduciary duty to PPR;" (2) "erroneously found David committed fraud;" (3) "erroneously ordered dissolution of PPR (a partnership) under the Mississippi LLC Act;" (4) awarded damages that were "arbitrary, not supported by any evidence, and mathematically incorrect;" (5) "denied [David's] right to a fair trial," committing "procedural and other egregious errors;" (6) "erroneously denied David's Counterclaim;" and (7) "erroneously denied David's Motion for a New Trial."

In Bryan's cross-appeal, he claims: "[t]he [s]uccessor [c]hancellor erred when it awarded only 44.9% of the assets" to him and "requests this [C]ourt to reverse and render that portion of the Amended Order of Attorney's Fees and Damages which only awarded unto Bryan 44.9% of the assets[.]"

We address each in turn.

> **I.  Whether the chancery court erred in finding David liable for his actions as general partner**.

¶56.    On appeal, David argues it was error for the chancery court to find a breach of fiduciary duty. He generally argues any "expenditure[] . . . was a business decision" he undertook for the benefit of PPR. David contends that, as business decisions, "these actions do not and cannot equate to fraud or the breach of any fiduciary duty." He further argues that even if he self-dealt, "the law does not prohibit self-dealing transactions so long as they are 'intrinsically fair.'"

¶57.    Additionally, David argues "the trial court erroneously concluded David committed fraud" because "there is no record evidence David made a representation upon which Bryan reasonably relied." Therefore, he asserts it was error for the chancery court to find him liable at all.

¶58.    To establish a breach of fiduciary duty claim, there must be a fiduciary relationship and a breach of fiduciary obligations. *Callicutt v. Pro. Servs. of Potts Camp Inc.*, 974 So. 2d 216, 221 (¶23) (Miss. 2007). "A fiduciary relationship is a broad term embracing technical fiduciary relations and informal relations which exist wherever one person trusts in or relies upon another." *Robley v. Blue Cross/Blue Shield of Miss.*, 935 So. 2d 990, 994 (¶10) (Miss. 2006). "Traditional fiduciary relationships are found in cases of trustee and beneficiary, partners, principal and agents, guardian and ward, managing directors and corporation." *Id*.

¶59.    Our Supreme Court has specifically found that "a fiduciary duty exists among partners

18

in a partnership[.]" *Landrum v. Livingston Holdings LLC*, 396 So. 3d 1026, 1046 (¶79) (Miss. 2024).

¶60.    Here, Bryan and David both concede that a fiduciary relationship exists between them as partners of PPR.

¶61.    As a limited partnership, PPR is governed by the Mississippi Uniform Limited Partnership Act. Pursuant to section 79-14-409(a), "[a] general partner owes to the limited partnership and . . . the other partners the duties of loyalty and care[.]" Miss. Code Ann. § 79-14-409(a) (Rev. 2024).

¶62.    Subsection (b) of the statute elaborates that "[t]he fiduciary duty of loyalty" requires the general partner:

> (1)    To account to the limited partnership and hold as trustee for it any property, profit, or benefit derived by the general partner:
>> (A)    In . . . the partnership's activities and affairs;
>> (B)    From a use . . . of the partnership's property; or
>> (C)    From the appropriation of a partnership opportunity;
> (2)    To refrain from dealing with the partnership . . . as or on behalf of a person having an interest adverse to the partnership; and
> (3)    To refrain from competing with the partnership in . . . the partnership's activities and affairs.

*Id*. § 79-14-409(b). Subsection (c) states: "The duty of care of a general partner . . . is to refrain from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or knowing violation of law." *Id*. § 79-14-409(c). Relatedly, the statute further requires: "A general partner shall discharge the[ir] duties and obligations . . . and exercise any rights consistently with the contractual obligation of good faith and fair dealing." *Id*.

¶63. The chancellor made a finding of fact that as general partner, David owed PPR and Bryan the fiduciary duties of loyalty and care outlined by statute. The chancery court had before it voluminous records and ample testimony that David virtually pillaged PPR.

¶64. The chancellor heard David's admissions that he owned another company, Triad, which leased space in Briarwood but did not pay rent. David and his accountant admitted that unpaid rent accumulated in the amount of $384,544.79. And at oral argument before this Court, David conceded that he failed to pay Briarwood. Also, David used PPR's land in Rankin County to sell dirt and timber but the approximately $780,000 in proceeds he received were unaccounted for in PPR's account.

¶65. There was further proof that David wrote checks to his girlfriend from PPR accounts to the tune of nearly $300,000. Additionally, evidence was presented showing that "576 checks were written directly to David C. Robertson individually, . . . while 200 deposits were received from him;" meanwhile "only 36 checks were written directly to Bryan K. Robertson while 7 deposits were received from him." So 94% of the checks written were to David, despite them being equal partners.

¶66. "[T]he trial judge is in the best position to view the trial[;]" the trial judge "hears the witnesses live, observes their demeanor and in general smells the smoke of the battle." *Little v. State*, 233 So. 3d 288, 291 (¶18) (Miss. 2017) (quotation marks omitted) (quoting *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶16) (Miss. 2000)).

¶67. In light of our deferential standard of review, we cannot find the chancery court erred

when it found David liable for breaching his duties as general partner of PPR.

¶68. While David challenges both findings of liability, we find the existence of a breach of fiduciary duty alone warrants damages, so we do not review his argument that the elements of fraud were not met.

## II. Whether the chancery court erred in computing damages.

¶69. On appeal, David argues "the successor judge's formula for determining damages was arbitrary and capricious." He claims the chancellor "handpicked and tallied two figures presented by Bryan, completely disregarded David's Accounting (despite the trial judge's repeated insistence on its importance to determine damages), and she multiplied the total of those two figures by Bryan's (incorrect) partnership percentage."[10]

¶70. "In the context of a damages assessment, which is a finding of fact, the appellate court must review the damages award by looking to the 'facts of each case.'" *Lane v. Lampkin*, 234 So. 3d 338, 346 (¶14) (Miss. 2017) (quoting *Lane v. Lampkin*, 175 So. 3d 1222, 1227 (¶7)

---

[10] David filed an exhibit with his appellate brief, titled, "Appellants' Calculations Under Mississippi Rules of Appellate Procedure 14(c)." Pursuant to Rule 14(c),

> When a party relies on an error in the calculation of interest or damages as a reason for altering a judgment, a true calculation shall be presented to the appellate court, in writing and figures, with a certificate by a certified public accountant not interested in the cause, that the calculation is correct; and no such error will be noticed unless so presented to the Supreme Court or the Court of Appeals.

MRAP 14(c). Byran filed a motion to strike this exhibit, arguing it is new evidence that was not made part of the trial record. Because we ultimately reverse and remand the calculation of damages, we determine the motion is moot.

21

(Miss. 2015)). A damage award will be "overturned when the trial judge has abused his discretion or 'in exceptional cases where such awards are so gross as to be contrary to right reason.'" *Id*. Furthermore, the chancery court's "award of damages must be reversed if it is speculative and is not based on the evidence presented at trial." *Soffra*, 314 So. 3d at 143 (¶54).

### A.    Percentage of Interest

¶71.    As a result of David's breach of duties, the chancellor found "Plaintiff is entitled to actual damages." The chancery court computed those damages "based on the Plaintiff's 44.9% interest in PPR."[11]

¶72.    On appeal, the parties agree that the correct percentage is "49.5%." Indeed, Bryan filed a cross-appeal to raise this sole point.

¶73.    We find the chancellor's ruling incorrectly identified Bryan's and David's interest percentage in PPR. Therefore, we reverse and render a determination that Bryan has a 49.5% interest in PPR. We further render a finding that David holds a 49.5% interest in PPR as limited partner and holds an additional 1% interest in PPR as acting general partner.

### B.    Supporting Evidence

¶74.    Secondly, the evidence is sufficient to support a finding that Bryan may have suffered

---

[11] For context, the chancellor used the erroneous percentage of 44.9% in the December 2023 order and "awarded [damages] in the amount of $91,760.57." Then when the chancery court entered its subsequent March 2024 order, the damages were again computed "based on the Plaintiff's 44.9% interest in PPR." The "actual damages" were "awarded in the amount of $917,605.70" in that order.

damages as a result of David's breaches, but it does not support the amount of damages awarded by the chancellor here. *Id.* at (¶58).

¶75. The chancellor awarded "actual damages" to Bryan. "Actual damages are defined as follows: 'Compensation for *actual injuries or loss*. Actual damages flowing from injury, . . . which are to be distinguished from damages which are nominal, exemplary or punitive." *Murrell v. Brown*, 202 So. 3d 287, 291 (¶12) (Miss. Ct. App. 2016) (quoting *Gorman v. McMahon*, 792 So. 2d 307, 316 (¶22) (Miss. Ct. App. 2001)).

¶76. "[T]he plaintiff has the burden of proving any amount of damages with reasonable certainty." *Bros. v. Winstead*, 129 So. 3d 906, 925 (¶63) (Miss. 2014). More particularly, the plaintiff is "required to provide substantial proof of damages *that he suffered* so the [chancellor] could have a reasonable basis to assess *his loss*." *Id*. (emphasis added).

¶77. Bryan had the burden to prove damages stemming from David's breach. As such, Bryan was required to present evidence that he personally suffered actual loss from David's alleged misappropriations of PPR funds and self-dealing—and the amount of any such loss.

¶78. As acknowledged by the original chancellor in the February 2021 order, in this type of claim an accounting is necessary first to determine damages Bryan may be entitled to recover. As established above, Bryan only possesses a 49.5% interest in PPR.

¶79. An accounting "is a need[ed] . . . to determine where the money is and what form it now assumes so that the court may decide the best way for [plaintiff] to recover the money, if any, that [he] is due." *Re/Max Real Est. Partners Inc. v. Lindsley*, 840 So. 2d 709, 713

23

(¶23) (Miss. 2003). Our Supreme Court has described "an accounting as a written financial statement containing all receipts and disbursements[.]" *Univ. Nursing Assocs. PLLC v. Phillips*, 842 So. 2d 1270, 1274 (¶8) (Miss. 2003). More specifically,

> An accounting is by definition a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation. It is a statement in writing of debts and credits or of receipts and payments. Thus an accounting is an act or a system of making up or settling accounts, consisting of a statement of the account with debits and credits arising from the relationship of the parties.

*Id*. (quoting *State ex rel. King v. Harvey*, 214 So. 2d 817, 819 (Miss. 1968)).

¶80.   Ordering an accounting "help[s] determine how the money has been used or distributed and whether defendants benefitted from [a person's] alleged misappropriation." *Re/Max*, 840 So. 2d at 713 (¶23). The "[d]iscovery of the location and form of the misappropriated funds may define the extent of the breach, if any[.]" *Id*. at 714 (¶26). The results of "an accounting may be dispositive of the other issues in [a] case" as well. *Id*.

¶81.   Here, because Bryan requests damages based on misappropriated PPR funds, his "accounting claim is the pivotal claim by which [his] other claims will be measured and by which proper relief may be granted." *Id*.

¶82.   After a two-day trial on the merits, the chancellor ordered the defendants to provide a full accounting. The chancellor specifically granted "an accounting to determine damages," "and the first step in granting relief of damages requires an accounting." The defendants followed the chancellor's order and filed their accounting in March 2021, shortly after the first ruling was entered.

24

¶83.    Nevertheless, when the chancery court later made its determination on damages, it only relied upon the pre-trial accounting report obtained by Bryan in 2019 from HRK in assessing damages. But the CPA hired by Bryan testified that his accounting report did not include—and was not intended to provide—any accounting trail as to how or when PPR funds were spent. Rather, his report was premised on simply addressing whether the transactions reflected in PPR's account records were supported by evidence of a contract or agreement, and whether the transactions had a valid business purpose. They were not intended to show the extent to which Bryan suffered damages, if any. Nor did the HRK report apportion any damages to Bryan's 49.5% ownership interest in PPR.

¶84.    In a decision by our Supreme Court in a family business case, the Court emphasized the need for precision in determining damages, holding:

> The chancellor found that Harry had misappropriated corporate funds and breached his fiduciary duty to Tom. Although more than $313,000 was at issue, the chancellor determined that it was only clear from the evidence that Harry received a personal benefit of $54,490. Therefore, the chancellor only awarded Tom $27,245, representing his one-half interest of Harry's personal expenses, because Tom failed to show that the remaining funds in controversy had actually been diverted.

*Griffith*, 997 So. 2d at 223 (¶18). The Court further found,

> Since the evidence was unclear whether Harry diverted the remaining funds in controversy, we find that the chancellor's award to Tom, representing Tom's one-half interest of the personal expenses that Harry charged to RGC's account, was proper.

*Id*.

¶85.    In contrast to *Griffith*, here, the report's identification of "unsubstantiated charges and

disbursements" does not show—and was not intended to show—evidence of damages caused by funds being diverted, how the funds were misappropriated, or to what extent funds were received by David as a personal benefit.

¶86. Therefore on remand, it is necessary for the chancery court to consider the extent of damage, if any, as to the amount David diverted and misappropriated funds from PPR, or received money from the family partnership to his personal benefit and to the harm of Bryan. To be clear, the chancellor is free to consider any evidence in the record in making this determination, including the conceded amount of $384,544.79 in rent that David's company Triad failed to pay Briarwood LLC before foreclosure of the office building. Furthermore, on remand, the chancellor is to consider what amount, if any, Bryan is owed per his share of 49.5% interest in PPR.

¶87. We find the chancery court's actual damages computation was error. We reverse and remand the damages award for the chancellor to consider: the parties' arguments on damages and any applicable proof in the record; what funds, if any, David received as personal benefit or diverted from PPR; and what loss, if any, Bryan has a right to recover as a 49.5% interest holder in PPR.

### III. Whether the chancery court erred in awarding attorney's fees.

¶88. On appeal, David argues the chancery court erred by "award[ing] attorney's fees without legal basis" and because "its shifting computation of attorney's fees was arbitrary." He contends that the chancellor should not have awarded attorney's fees since "the court

26

declined to award punitive damages." Further, David insists there is no evidence to support finding that David "committed actual fraud," so "Bryan's fraud claim fails and with it, the award of attorney's fees."

¶89. Additionally, David argues the "successor judge's shifting computation" was "arbitrary" because the chancellor "modified the award" twice, "all without any explanation for the shifting awards or the amounts awarded."

¶90. "[B]efore granting or denying attorney's fees, a chancellor must apply the *McKee* factors." *In re Est. of Stimley*, 395 So. 3d 441, 444 (¶8) (Miss. Ct. App. 2024) (quoting *Gilmer v. Gilmer*, 297 So. 3d 324, 339 (¶53) (Miss. Ct. App. 2020)).[12] "[W]hile it was true that the lack of a factor-by-factor analysis does not immediately warrant a reversal, there must be proof supporting an accurate assessment of fees under the *McKee* criteria." *Id*. at 445 (¶10) (internal quotation marks omitted) (quoting *Gilmer*, 297 So. 3d at 339 (¶53)).

¶91. Bryan's counsel filed a motion seeking $190,951.96 in attorney's fees. In the chancery court's first order ruling on attorney's fees, the chancellor advised, "This Court previously determined, on December 14, 2023, that the Plaintiff is entitled to $180,000 in attorney fees." However, the chancellor declared, "The Court now modifies its initial award of attorney fees in the amount of $180,000 to $130,000.00." The order contains a general discussion listing the applicable *McKee* factors and some details about Bryan's counsel's representation, but at no point did the chancellor explain the reason for modifying the award or for picking the

---

[12] *See Mckee v. McKee*, 418 So. 2d 764, 797 (Miss. 1982).

specific decreased amount of $130,000.

¶92.    Then in the chancery court's sua sponte amended order, the chancellor again recounted that it "previously determined, on December 14, 2023, that the Plaintiff is entitled to $180,000 in attorney fees," and "modified that amount in its December 18, 2023 order." Yet, the chancellor changed the attorney's fees award again, concluding in its final order, "Due to the Court's clerical error regarding the award of damages, the Court will now reinstate its initial award of attorneys' fees," "in the amount of $180,000." The chancellor did not provide any further explanation or discussion regarding the significant change in the amount awarded.

¶93.    On appeal, based on the facts of this case, we are compelled to agree with David.  The chancery court's December 2023 and March 2024 orders do reference the *McKee* factors and consider the factors.  However, it is wholly unclear how the chancellor reached the amount of the award.

¶94.    The chancery court's amended order awarding attorney's fees (as well as its pre-amendment order) in this case failed to make a sufficient finding under the *McKee* factors when it decided to modify or when it determined the amount to grant.

¶95.    In one recent case, we reversed a trial court after it had seemingly plucked a number for attorney's fees from thin air.  A law firm had requested nearly $50,000 in fees for work in a complex estate case; without reference to *McKee*, the trial court found the request "astronomical" and instead granted an award of $5,000. *Stimley*, 395 So. 3d at 444 (¶8).

28

¶96. On appeal, we reversed the attorney's fees award. *Id*. This Court found it was not only problematic that the trial court did not apply *McKee* factors, but "[t]here [was] no reasoning given in the order as to why" the law firm "would only be awarded $5,000" after there were "detailed invoices requesting fees in the amount of $48,167.75." *Id*. So we remanded the case to the trial court for a consideration of the *McKee* factors. *Id*.

¶97. The shifting fee awards in this case echo the arbitrary fee award in *Stimley*. The trial court awarded an amount less than what Bryan's attorney requested but then flip-flopped between two different amounts—*sua sponte* changing the amount by $50,000 each time. As such, we cannot be assured that a fair and full consideration of this matter was given in light of the changing awards. Therefore, we reverse the award of attorney's fees and remand for a full consideration of the *McKee* factors and the factual basis for the calculation of the award.[13]

## IV. Whether the chancery court erred in dissolving PPR.

¶98. On appeal, David argues the chancery court erred in dissolving PPR "because it applied the LLC Act," and "[s]uch an [o]rder was incorrect on its face because PPR, a partnership, is instead subject to the Mississippi Uniform Limited Partnership Act."

---

[13] Additionally, the record does not seem to contain the evidentiary support for Bryan's counsel's attorney's fees requested. Counsel alleged in this motion that "[t]he Plaintiff's attorney fees incurred through December 20, 2020 were entered into evidence during the trial of this matter" and "total $87,480.03." However, after scouring the 3,200 page record, we cannot find the fees were indeed entered into evidence at trial. On remand, the chancery court is free to consider any proof presented on the record.

¶99. David is correct that at some points the chancery court references the Limited Liability Corporations Act. *See* Miss. Code Ann. § 79-29-803 (Rev. 2024). However, the references to the LLC statutes that he relies on are found in later orders and do not arise until after the chancellor originally ordered dissolution.

¶100. The chancellor ordered dissolution from the start, as found in its February 2021 order after the trial on the merits.

¶101. The Mississippi Uniform Limited Partnership Act states that a chancellor may dissolve a partnership on the grounds that:

(A) The conduct of all or substantially all the partnership's activities and affairs is unlawful; or
(B) It is not reasonably practicable to carry on the partnership's activities and affairs in conformity with the certificate of limited partnership and partnership agreement[.]

Miss. Code Ann. § 79-14-801(a)(6) (Rev. 2024).

¶102. In the chancery court's original order, the chancellor found several instances of nonconformity with PPR's partnership agreement—by both brothers. The chancellor also found that David had taken actions that were financially detrimental to PPR and that he had used his 2 other companies in doing so. PPR was not only in debt but had to sell off multiple assets—a $7,500,000 building and nearly 200 acres in land—due to David's mismanagement. Based on the totality of the chancellor's order, we cannot find the chancellor erred in ordering the dissolution of PPR.

    **V. Whether the chancery court erred in denying David's counterclaim.**

¶103. Lastly, David claims that the chancery court erred by denying his "[c]ounterclaim because it did so without any explanation or supporting evidence." David's counterclaim "alleg[ed] Bryan had unclean hands and his claims lacked substantial justification."

¶104. But David ignores the elephant in the room—that the trial court expressly found that he breached his fiduciary duty to Bryan, causing him monetary harm. Impliedly, the trial court rejected David's counter-theory that his brother had unclean hands or that his claims were without support.

¶105. In any event, while the rest of his arguments on appeal are robust, this assignment of error lacks any citation to legal authority. "Mississippi Rule of Appellate Procedure 28(a)(7) requires that an appellant in their arguments in their brief 'shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes and parts of the record relied on.'" *Landrum*, 396 So. 3d at 1047 (¶82) (quoting MRAP 28(a)(7)). The "failure to cite legal authority in support of an issue is a procedural bar on appeal." *Id*. (quoting *Rex Distrib. Co. v. Anheuser-busch LLC*, 271 So. 3d 445, 452 (Miss. 2019)).

## VI.     Whether the chancery court erred in denying David a new trial.

¶106. On appeal, David argues it was error for the chancery court to deny his request for a new trial. He argues error, in part, "because it failed to correct a clear error in the original judgment," which "contained mathematical inaccuracies" and "calculated an incorrect PPR percentage for Bryan, using 44.9% instead of 49.5%." David further argues, in part, that a

31

new trial was warranted because of the successor chancellor's "utter unfamiliarity with the record, demonstrated by her own statements that she was unaware of the experts and unaware of the existence of a final judgment," which resulted in "issu[in]g a confusing, flawed [o]rder."

¶107. Appellate courts review the grant or denial of a motion for a new trial under an abuse of discretion standard. *Britt v. Orrison*, 323 So. 3d 1135, 1144 (¶32) (Miss. Ct. App. 2021). We find a new trial is not warranted on this basis because the findings of liability were heard in their entirety by the same chancellor. When the successor judge took over the case, the only thing left to do was to determine damages—which was separate from the bifurcated trial on the merits. In any event, David cites no rule or case that requires reversal simply because a different judge presides over a subsequent phase of court proceedings.

¶108. Because we reverse and remand due to an error in the calculation of damages, the request for a new trial is further moot.

## CONCLUSION

¶109. As to the chancellor's finding that Bryan presented substantial evidence to show that David breached his general partner duties and as such breached his fiduciary duty, we affirm. However, having found crucial errors in the computation of damages and award of attorney's fees, we reverse and remand the chancery court's judgments to that extent. This case is remanded to the chancery court on the issue of damages and the award of attorney's fees, if any, and for any related matters consistent with this opinion.

¶110. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND McDONALD, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., NOT PARTICIPATING.**